**UNITED STATES of America**

v.

**STATE OF LOUISIANA.**

**Civ. A. No. 80–3300.**

United States District Court, E.D. Louisiana.

July 19, 1989.

502

Nathaniel Douglas, Franz R. Marshall, Levern Younger, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for U.S.

John N. Kennedy, Sp. Counsel to the Governor, Baton Rouge, La., Joseph J. Levin, Jr. and Carla Calobrisi, Adams, McCullough & Beard, Washington, D.C., for State of La. and the Governor of State of La.

Margaret E. Woodward, New Orleans, La., for Bd. of Regents of State of La.

W. Shelby McKenzie and Nancy Tyler, Baton Rouge, La., for Louisiana State University Bd. of Supervisors.

William Jefferson, New Orleans, La., for Southern University Bd. of Supervisors.

Robert A. Kutcher and Jan Marie Hayden, New Orleans, La., for Bd. of Trustees of State Colleges and Universities.

Thomas N. Todd, Chicago, Ill., for Grambling State Alumni Ass'n.

Henry N. Brown, Jr., 26th Judicial Dist. Court, Benton, La., for Bossier Parish School Bd.

Winston DeCuir, Dept. of Justice, Baton Rouge, La., for State Bd. of Elementary and Secondary Educ.

Before WISDOM, Circuit Judge, and CHARLES SCHWARTZ, Jr., and WICKER, District Judges.

## OPINION AND ORDER

This matter came before the Court for hearing on the parties' objections to the Special Master's Final Report and Proposed Order of May 26, 1989. In addition to reviewing those aspects of the Report and Order challenged by the parties' objections, the Panel reviewed the entire Report and Order independently. To the extent any matters set forth in the Report and Order were based on findings of fact, those findings were reviewed under the clearly erroneous rule. To the extent any matters contained therein were based on conclusions of law, those conclusions were reviewed *de novo.*

In light of the Panel's review and the parties' objections, the Panel rules as follows: The Panel hereby adopts the Final Report and Proposed Order as its own, except to the extent they are modified as stated below. Thus, the whole of the Master's Report forms the basis of the Court's Order, except where the Panel expressly departs from the Master's findings and recommendations.

Without limiting those of the Master's findings generally adopted by the Panel, the Court directs specific attention to following extractions from the Master's Report, as modified where necessary:

Louisiana currently has seventeen general state institutions of higher learning, organized under four separate governing boards.[1] The Board of Regents has gener-

1. The findings appearing herein on pages 2–12 are taken from pp. 8–21 of the Special Master's Final Report ["Report"]. Throughout this Or-

der, the Master's citations to the statements and depositions of particular witnesses have been

al responsibility for planning, coordinating and reviewing the budgets and academic program offerings of each state university. Each of the three remaining boards has separate direct management authority for a number of the universities. The Louisiana State University Board of Supervisors ("LSU Supervisors") oversees Louisiana State University and Agricultural and Mechanical College in Baton Rouge ("LSU A & M"), the University of New Orleans ("UNO"), Louisiana State University at Shreveport ("LSU–S"), Louisiana State University at Alexandria ("LSU–A") and Louisiana State University at Eunice ("LSU–E"). The Southern University Board of Supervisors ("Southern Supervisors") oversees Southern University at Baton Rouge ("SUBR"), Southern University at New Orleans ("SUNO") and Southern University at Shreveport/Bossier City ("SUSBO"). The Board of Trustees for State Colleges and Universities ("Trustees") oversees Louisiana Tech University in Ruston ("Louisiana Tech"), Grambling State University ("Grambling"), University of Southwestern Louisiana in Lafayette ("USL"), Northeast Louisiana University in Monroe ("Northeast"), Northwestern State University in Natchitoches ("Northwestern"), Southeastern Louisiana University in Hammond ("Southeastern"), McNeese State University in Lake Charles ("McNeese"), Nicholls State University in Thibodaux ("Nicholls") and Delgado Community College in New Orleans ("Delgado").

Of these institutions, LSU–A, LSU–E, SUSBO and Delgado have only two-year programs. Additionally, SUNO maintains a number of two-year programs as well as four-year programs. Two other public community colleges—Bossier Parish Community College and St. Bernard Parish Community College—are separately managed by the State Board of Elementary and Secondary Education and are no longer defendants in this case, having been granted summary judgment in the Court's August 2, 1988, ruling. *See United States v. Louisiana,* 692 F.Supp. 642, 658–59 (E.D.

La.1988). There is not, however, any statewide system of community colleges and a number of regions in the state—most notably the state capital of Baton Rouge—have no two-year community college.

The remaining schools listed above have four-year undergraduate programs and varying programs for graduate studies. Three state professional schools are also organized under the same three management boards. The Louisiana State University Medical Center, located in New Orleans and Shreveport, and the Paul M. Hebert Law Center, located in Baton Rouge, are overseen by the LSU Supervisors. The Southern University Law Center, also in Baton Rouge, is overseen by the Southern Supervisors. Finally, LSU has a separate Agricultural Center in Baton Rouge, overseen by the LSU Supervisors.

The current governing structure for state universities was created as part of a revision of the Louisiana Constitution in 1974. Prior to 1974, statewide coordination was provided by the Louisiana Coordinating Counsel for Higher Education, itself created in 1968, which had more limited powers than the current Board of Regents. Most of the state universities were governed by the State Board of Education at that time, although the Louisiana State University Board of Supervisors separately governed the LSU schools. The 1974 constitutional revisions divided the direct governance for state universities into the three current governance boards and gave the Regents enhanced, though not complete, control over budgetary and program matters.

As the Court's August 2, 1988, opinion discusses, four state universities—SUBR, SUNO, SUSBO and Grambling—were originally established as institutions for blacks only. 692 F.Supp. at 647. The remaining four-year state universities were established for whites only. It was not until some time after the enactment of the Civil Rights Act of 1964 that the State of Louisiana discontinued official recognition of state universities as single race institutions. However, with respect to most

omitted, as reference to such sources can be obtained directly from the Master's Report.

schools, de facto racial identifiability has continued to the present. The chart below (updating the chart provided in the Court's August 2, 1988, opinion, 692 F.Supp. at 645) notes the enrollment at each institution, by race, comparing 1981, the year the consent decree was implemented, with 1988.

Enrollment at Louisiana Public Universities By Race, 1981 and 1988

| | 1981 Black | | White | | Total | 1988 Black | | White | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | | # | % | # | % | |
| University Trustees | | | | | | | | | | |
| Delgado | 3,371 | 40.1 | 4,348 | 51.7 | 8,404 | 2,2577 | 31.5 | 4,268 | 59.6 | 7,161 |
| Grambling | 3,777 | 98.5 | 44 | 1.1 | 3,834 | 5,626 | 95.8 | 225 | 3.8 | 5,870 |
| Louisiana Tech | 1,194 | 11.6 | 8,489 | 82.5 | 10,288 | 1,236 | 12.7 | 7,186 | 73.7 | 9,751 |
| McNeese | 1,062 | 15.3 | 5,706 | 82.2 | 6,943 | 1,004 | 13.8 | 6,156 | 84.3 | 7,300 |
| Nicholls | 1,068 | 15.0 | 5,954 | 83.6 | 7,119 | 819 | 11.5 | 6,180 | 86.6 | 7,139 |
| Northeast | 2,431 | 22.0 | 8,544 | 77.2 | 11,071 | 1,539 | 15.1 | 8,461 | 83.0 | 10,193 |
| Northwestern | 1,296 | 19.4 | 4,448 | 66.6 | 6,682 | 1,258 | 19.5 | 4,768 | 74.1 | 6,438 |
| Southeastern | 1,112 | 12.6 | 7,633 | 86.2 | 8,854 | 577 | 6.7 | 7,868 | 91.7 | 8,582 |
| USL | 2,380 | 17.4 | 10,931 | 79.8 | 13,702 | 2,478 | 17.5 | 11,200 | 79.2 | 14,143 |
| LSU Supervisors | | | | | | | | | | |
| LSU–A | 151 | 9.9 | 1,357 | 88.8 | 1,528 | 214 | 9.7 | 1,949 | 88.6 | 2,201 |
| LSU–A&M | 1,688 | 6.3 | 22,832 | 84.7 | 26,964 | 1,906 | 7.5 | 22,259 | 88.0 | 25,296 |
| LSU–E | 237 | 15.5 | 1,283 | 84.0 | 1,528 | 242 | 13.9 | 1,483 | 85.1 | 1,743 |
| LSU Law School | 16 | 1.9 | 830 | 96.1 | 864 | 30 | 3.8 | 746 | 94.9 | 786 |
| LSU–S | 315 | 7.6 | 3,803 | 91.5 | 4,155 | 381 | 8.5 | 3,991 | 88.9 | 4,490 |
| UNO | 2,491 | 16.1 | 11,519 | 74.6 | 15,432 | 2,439 | 15.5 | 12,053 | 76.5 | 15,752 |
| Southern Supervisors | | | | | | | | | | |
| SUBR | 7,655 | 86.4 | 288 | 2.6 | 8,855 | 8,267 | 92.7 | 398 | 4.5 | 8,921 |
| SUNO | 1,994 | 82.4 | 11 | 0.5 | 2,420 | 3,130 | 83.9 | 436 | 11.7 | 3,731 |
| SUSBO | 661 | 99.8 | 1 | 0.2 | 662 | 1,118 | 89.7 | 122 | 9.8 | 1,246 |
| Total | 32,899 | 23.6 | 97,961 | 70.3 | 139,305 | 34,521 | 24.5 | 99,749 | 70.9 | 140,743 |

As the chart illustrates, the racial identifiability of Louisiana's state universities is especially evident in the coexistence of predominantly black institutions (PBIs) and predominantly white institutions (PWIs) in close geographic proximity in four areas of the state. In New Orleans, SUNO currently has 83.9 percent black and 11.7 percent white enrollment, while UNO has 15.5 percent black and 76.5 percent white enrollment. In Baton Rouge, SUBR has 92.7 percent black and 4.5 percent white enrollment, while LSU A & M has 7.5 percent black and 88.0 percent white enrollment. In the Shreveport/Bossier City area, SUSBO has 89.7 percent black and 9.8 percent white enrollment, while LSU–S has 8.5 percent black and 88.9 percent white enrollment. Finally, in Lincoln Parish, Grambling has 95.8 percent black and 3.8 percent white enrollment, while Louisiana Tech, in nearby Ruston, has 12.7 percent black and 73.7 percent white enrollment.

The governing boards of these universities are also racially identifiable. The Board of Regents currently has sixteen members, thirteen (81 percent) of whom are white and three (19 percent) of whom are black. Of the eighteen LSU Supervisors, fourteen (78 percent) are white and four (22 percent) are black. The Southern Board of Supervisors has four white (22 percent) and fourteen black (78 percent) members. The Trustees are the most integrated of the four boards, with thirteen of eighteen members (72 percent) white and five members (28 percent) black. According to the most recent data available, the total population of the State of Louisiana is 4.5 million, 69 percent white and 29 percent black.

Given the racially identifiable membership of the Boards, none, including the Southern board which vigorously seeks to preserve its separate identity, is an exponent of racial integration. Retaining such vestiges of segregation is not an appropriate solution to the problems before this Court, and it can never be forgotten that this case is about the integration of all of

Louisiana's institutions of higher education.[2]

 A truism thus emerges: The present scheme for governing education in Louisiana—three operating boards and one coordinating board—has perpetuated illegal segregation in Louisiana's higher education, even though the system's creation postdates the filing of this case. The system of multiple boards is therefore a defect in the state's system of higher education that violates the federal constitution. In addition, the scheme almost guarantees a standoff between two "systems" (LSU and Southern) and the rest of higher education. The strongest argument of those favoring the present multi-board system is that the structure of higher education in Louisiana is irrelevant to the goals of desegregation and therefore it ought not be changed.[3]

As stated above, the Panel rejects this argument outright.

Statistics regarding student performance, discussed below, demonstrate additional particular constitutional defects inherent in and perpetuated by Louisiana's present system of higher education.

According to the statewide student profile compiled by the Board of Regents (SSPS), in the fall of 1988 only 27,146 freshmen enrolled in state universities, but given past patterns, most of them will not graduate. Dr. Tremblay, Coordinator of Research and Data Analysis, Board of Regents, submitted a chart which analyzed the status of students after six years who entered as freshmen in fall 1982. It shows the graduation rates for each of Louisiana's seventeen universities over the six-year period:

#### Graduation Rates at Louisiana Public Universities, 1982 to 1988

| Institution | Number Enrolled Fall 1982 | Graduated by Spring 1988 Number | Percentage |
|---|---|---|---|
| Trustees | | | |
| Delgado | 705 | 106 | 15.0 |
| Grambling | 674 | 287 | 42.6 |
| Louisiana Tech | 1,644 | 761 | 46.3 |
| McNeese | 1,285 | 330 | 25.7 |
| Nicholls | 1,398 | 477 | 34.1 |
| Northeast | 1,580 | 534 | 33.8 |
| Northwestern | 745 | 258 | 34.6 |
| Southeastern | 1,695 | 546 | 32.2 |
| USL | 2,310 | 788 | 34.1 |
| LSU Supervisors | | | |
| LSU A & M | 4,486 | 2,103 | 44.9 |
| LSU–A | 421 | 88 | 20.9 |
| LSU–E | 270 | 89 | 33.0 |
| LSU–S | 464 | 110 | 23.7 |
| UNO | 1,931 | 364 | 18.9 |
| Southern Supervisors | | | |
| SUBR | 1,294 | 328 | 25.3 |
| SUNO | 352 | 30 | 8.5 |
| SUSBO | 216 | 24 | 11.1 |
| TOTAL | 21,470 | 7,133 | 33.2 |

As the chart shows, no state university in Louisiana graduated half of its enrollees within six years, and six institutions failed to graduate even one quarter of their enrollees. Overall, of the 21,470 students who enrolled as first-time freshmen in the fall of 1982, only 7,133 or 33.2 percent had graduated by the spring of 1988, six years later. The national average for public universities is 44.9 percent graduated over six

2. See Report, p. 53.

3. See Report, p. 48.

years. *See* American Council on Education, Digest of Education Statistics 249 (1988) (percentage of students entering in 1980 who graduated within the following six years).

The overwhelming majority of students enrolled in state universities in Louisiana are state residents. According to Board of Regents SSPS data, of first-time freshmen in the fall of 1988, 90.3 percent were Louisiana residents and 9.7 percent were non-residents. Moreover, 58.5 percent of the first-time freshmen in this sample entered a university in their home parish or in a parish adjacent to their home parish, while 41.5 percent ventured further from contiguous parishes to attend college within the state.

In addition, black students and PBIs account for a much greater percentage of non-resident students and students from non-contiguous parishes than do white students and PWIs. For instance, of the 2,627 non-resident students enrolling as first-time freshmen in fall 1988, 1,539 (58.5 percent) were black and 1,401 (53.5 percent) went to PBIs. By comparison, blacks made up only 28.0 percent of the total entered students. PBIs clearly attract more non-resident students and students from distant parishes within the state than do PWIs. In the fall of 1988, 33.7 percent of students at PBIs were non-residents and 63.4 percent came from non-contiguous parishes, while only 5.3 percent of students at PWIs were non-residents and 37.6 percent came from non contiguous parishes. Non-resident black students are also far more likely to go to PBIs than are resident blacks. Overall, 52.7 percent of black students entering in the fall of 1988 went to PBIs, but the rate was 88.2 percent for non-resident blacks attending PBIs as compared to 43.6 percent of resident blacks.

In fact, in 1988 only one state university, Grambling, a PBI, attracted more than half (55.4 percent) of its student body from out of state. Thus, Grambling is a "national" university in terms of the residences of its students, with California supplying the largest number of students after Louisiana. By comparison, at LSU A & M, Louisiana's "flagship" university, only 8.4 percent of its student body came from outside the state.

The relative college preparation level and college-going rates for black and white high school students in Louisiana further define the segregation problem confronting Louisiana education. According to date compiled by the Louisiana State Department of Education, there were 46,222 high school graduates in 1988, 15,018 (32.5 percent) of whom were black and 30,126 (65.2 percent) of whom were white. Of these 1988 graduates, 38,844 (84.0 percent) came from public high schools and 7,378 (16.0 percent) came from private high schools. Public high school graduates were disproportionately black (36.7 percent black/60.9 percent white) while private high school graduates were disproportionately white (10.4 percent black/87.5 per cent white). Viewed another way, 5.1 percent of black students graduated from private high schools, whereas 21.4 percent of white students graduated from private schools. This disparity is especially pronounced in certain areas, like Orleans Parish, where 83.9 percent of blacks go to public high schools but 90.0 percent of white students go to private high schools.

College-going rates in Louisiana are also much higher for white students than for black students. In 1988, 17,816 of the total 46,222 graduating high school students in Louisiana (38.5 percent) went to college but blacks accounted for only 4,263 of these college-going high school graduates, yielding a college-going rate for blacks of 28.4 percent. By contrast, whites accounted for 12,647 college entrants, yielding a 42.0 percent college-going rate for whites. This disparity in college-going rates has remained relatively constant in recent years. Five years ago, for instance, in 1983, the college-going rate for blacks was 29.2 percent and the college-going rate for whites was 42.5 percent.

Of those students who attend state universities in Louisiana, whites are much better prepared than blacks. According to 1987–88 data from the American College Testing Program (ACT), the mean high

school grade point average (GPA) for all public college attendees was 2.75. The mean GPA for blacks, however, was 2.54 while the mean GPA for whites was 2.80. Likewise, the mean ACT score for blacks was 12.74 compared to an 18.67 mean ACT score for whites. This disparity in preparation is also reflected in the percentage of first-time freshmen in state universities who are enrolled in "developmental" (i.e., remedial) education courses. According to Board of Regents data, in the fall of 1988, 12,897 (48.0 percent) of all first-time freshmen were enrolled in remedial courses, but the rate for black students (71.7 percent) was much higher than the rate for white students (38.5 percent).

The Louisiana system of public higher education is faced therefore with a lower college-going rate than the national average and a lower preparation level on average, with black students in each case being behind white. In what was formerly a dual system of higher education, the PBIs still educate over 50% of the black students who enter higher education. The Court's concern which led to the appointment of a Special Master was precisely that during the period of the consent decree from 1981 to 1987, while more black students entered higher education, the percentage of black students educated at PBIs versus PWIs increased. Thus, racial separation in higher education in Louisiana remains unresolved.

Given the disparate racial compositions of the student population at schools in close proximity, such as LSU A & M–SUBR in Baton Rouge, Grambling–Louisiana Tech in Ruston, UNO–SUNO in New Orleans, and LSUS–SUSBO in Shreveport, the merger of institutions has been considered. However, merger presents many problems without any sure benefits of desegregation.[4] Among the problems are merging student bodies of highly disparate academic backgrounds, potential loss of qualified faculty and administrators who were attracted to a

school because of its academic characteristics and goals, and undermining black institutions such as Grambling and Southern with substantial alumni following.[5] Thus, under the circumstances, an opportunity must be given for Grambling and Southern to make every effort to integrate before extreme solutions are considered. Therefore, as the Special Master recommends, the merger remedy is generally reserved at this stage [6], with the exception of desegregation of legal education, which as discussed below, presents unique considerations in the Panel's view.

Notwithstanding this Court's recognition of the historical importance of PBIs and its attendant refusal to order a merger remedy at this juncture, the focus of this litigation is not institutions but students.[7] *See* State of Louisiana Post–Trial Memorandum, at 35–37; *United States v. Alabama,* 791 F.2d 1450, 1455–56 (11th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987) (state universities cannot assert fourteenth amendment rights against the state). In 1988, 53 percent of Louisiana black entering freshmen were enrolled in PBIs and 47 percent in PWIs. This percentage of black students attending PBIs slightly exceeds that of 1981 when the consent decree began and indicates the failure of the consent decree approach. Nevertheless, the opportunities for blacks in Louisiana higher education are clearly tied to the entire state higher education system. Any desegregation plan should seek to increase the number of Louisiana blacks who attend college, which is below the national average, as well as to integrate the existing institutions, especially PBIs, whose percentage of other race students is below that of the PWIs. Over time, the challenge is to render the very terms PBI and PWI anachronistic.

The PBIs have developed attractive programs for black students, as reflected in the number of out-of-state black students. But education of out-of-state students

---

**4.** Report, p. 37 & n. 4.

**5.** *Id.* at pp. 36–37.

**6.** *Id.* at p. 35.

**7.** The matters appearing on pp. 507–508 herein are taken from Report, pp. 40–41.

(white or black) should not be a priority of institutions in a state where the college-going and graduation rates of whites and blacks are so low, especially if tuition levels are set so that in-state students subsidize out-of-state students. On the other hand, high out-of-state ratios indicate the popularity and reputation the PBIs have earned.

The more troubling implication is that the PBIs, while requesting additional money for enhancement, may be more intent on preserving their mission of serving black students than on expanding opportunities for white students. The experience of the consent decree confirms that enhancement of PBIs without more simply makes PBIs more attractive to black students, without attracting white students. The focus of the Court's remedial plan, however, must be on improving the ability of PBIs to educate both black and white students. Preserving Southern and Grambling for their educational importance means preserving them as institutions for all Louisiana citizens, not just for black students.

The evidence also suggests Louisiana's multi-board arrangement has led to unnecessary and costly program duplication.[8] The import of this finding is that the single board solution posits a relationship between efficiency and desegregation, particularly to the extent program duplication results from the multiboard structure in Louisiana. It is critical to the success of integrating the historically black institutions that they be upgraded and given desirable programs in order to attract a significant number of white students. Only by creating an organizational structure with the power to make program decisions statewide can these efforts be achieved. Inefficiencies also suggest the dissipation of scarce resources for higher education which, given the difficult fiscal times Louisiana is facing, can only further impair the state's ability to enhance its historically black institutions.[9] Thus, program duplication is highly relevant to desegregation.

The size of a single board is also a matter of interest.[10] Size bears on effectiveness and effectiveness obviously relates to the leverage the single board must assert to achieve desegregation. If a board is too large, its members will lack the necessary involvement. On the other hand, if the board is too small, it can be dominated by a few strong views. *See* Kerr and Gade, *The Guardians: Boards of Trustees of American Colleges and Universities* (forthcoming 1989) (where these factors are discussed and a minimum size board of nine to eleven is recommended).

As previously indicated,[11] the three operating boards in Louisiana each have eighteen members, broken down by race as follows: LSU Board of Supervisors (fourteen white/four black); Southern University Board of Supervisors (four white/four-

8. See *id.* at p. 49, citing Witness Statement of Roy McTarnaghan, Vice President for Academic Affairs for the University of Florida System, pp. 17–18, which charts program duplication in Louisiana as compared to Florida:

Comparison of Selected Bachelor's Degree Programs Offered and Degree Productivity: Florida and Louisiana Recent Five-Year Analysis

| Florida Programs Offered | | Florida Average Degrees Per Yr. | Florida Degrees/ Programs Per Yr. | Louisiana Programs Offered | Louisiana Average Degrees Per Yr. | Louisiana Degrees/ Programs Per Yr. |
|---|---|---|---|---|---|---|
| Horticulture | 2 | 29 | 14.6 | 6 | 12 | 2 |
| Animal Science | 2 | 57 | 28.5 | 10 | 84 | 8.4 |
| Architecture | 2 | 116 | 58 | 4 | 139 | 35 |
| Journalism | 3 | 178 | 59 | 9 | 91 | 10 |
| Speech Correction | 4 | 84 | 21 | 11 | 72 | 6.5 |
| Business Education | 6 | 67 | 11 | 13 | 72 | 5.5 |

9. See Report, pp. 51–52.

10. The matters appearing on pp. 16–17 of this Order are taken from Report, p. 54.

11. See p. 504, *supra.*

teen black); Board of Trustees (thirteen white/five black). The Board of Regents has sixteen members (including one student), three of whom are black. Under the circumstances, the size of the single board proposed by the Task Force of seventeen members (including one student) seems reasonable from the point of view of effectiveness.

■ However, the Panel specifically rejects the Special Master's finding that desegregation necessitates a conscious effort to place a quota of blacks on the new board in excess of the percentage of blacks in the population. The new board members must be chosen on the basis of their qualifications, with emphasis upon each board member's own educational background; his or her experience in teaching or education administration; and his or her commitment to the implementation of this Order. However, emphasizing qualifications does not diminish the impropriety of purposefully excluding black representation on the new board, and although no quota is ordered, the new board's racial composition must be consistent with the findings and directives of this Order.

With regard to the structure of a proposed remedial system and the roles of the particular institutions within the system, there is no obvious and necessary connection between organization and desegregation.[12] However, a strong correlation between classifying and tiering public institutions and desegregation may surely be inferred from structuring higher education to enhance quality while ensuring minority students participate at all levels. A system

producing better educated students benefits all concerned.

In formulating that aspect of a remedy bearing upon classification of institutions, no party contests establishing LSU as a flagship university with selective admissions standards.[13] The plans also suggest a second tier of institutions, labelled "doctoral" institutions according to generally accepted national classification schemes.[14]

The remaining four-year institutions may be labelled "comprehensive."[15] As a rule, these institutions should not offer doctoral programs.[16] They are: Grambling, LSU–S, McNeese, Northeast, Northwestern, Nicholls, Southeastern and SUNO. While the Southern Plan proposes further tiering among these institutions, there seems to be general agreement by the parties with their missions as they now stand. The board and President should explore the necessity for further tiering among these schools in due course, having in mind resource constraints as well as racial balance. The very purpose of tiering is to reduce duplication, not to encourage it.[17]

Tied to the tiering of institutions is the imposition of selective admissions standards. Central to the Special Master's analysis of selectivity and tiering is LSU's recent experience with the imposition of a modest selectivity program.[18] The testimony before the Special Master shows that relatively modest admissions standards (course work requirements but no rank in class or ACT minimum) served to produce better prepared applicants for admission, in effect forcing high schools to respond to the preparation challenge. And more im-

12. *See* Report, p. 65.

13. *Id.* at p. 64.

14. *Id.* at pp. 66–67.

15. *See id.* at p. 69 & n. 12. This term is adopted from the State/Task Force plan.

16. *See id.* at pp. 69–70. Several institutions that would be classified as comprehensive universities currently offer discrete doctoral degree programs. For instance, Grambling offers a doctoral degree in developmental education, Northeast offers a Ph.D. in Pharmaceutical Science and SUNO offers a Ph.D. and Ed.D. in Special Education. Grambling and Northeast have been especially vocal in arguing these programs

be maintained notwithstanding any reclassification or clarification of their school's mission. (*See, e.g.,* Proposed Amendments to Recommended Remedial Plan from the Grambling Alumni, at 1–4; State of Louisiana Suggested Amendments to Recommended Remedial Plan, at 3.) Such programs, like all others, must be studied by the new board. So long as they are educationally sound and consistent with the desegregation goals of this plan, discrete doctoral programs need not be eliminated solely to conform to the school's new categorization.

17. *Report* at p. 70, citing Chart set forth herein on p. 508, n. 8 *supra.*

18. *See* Report, pp. 71–73.

portantly, the number of black students entering LSU was not lessened; Board of Regents data show that 8.2 percent of the 1988 entering class was black, which actually marks a small increase over the historical percentage of black students at LSU.

The current practice of open admissions to all four-year institutions is counter-productive, both in terms of educational objectives and racial integration. The objective is not simply to admit students into college, but to educate and graduate them. In terms of undergraduate degree productivity, the Louisiana open admissions system is a failure.[19] As previously discussed,[20] system-wide only 33.2 percent of the students who entered higher education in Louisiana in 1982 had received bachelors and associates degrees after six years of attendance, far below the national average of 44.9 percent for public universities.

Thus, with an open admissions system, students enter higher education (both four and two years) easily, but do not readily leave with degrees. Moreover, the problem is particularly acute at institutions with a large black population, notably SUNO.

The Special Master's recommendations regarding the tiering of institutions included the creation of a community college system.[21] Louisiana has never embraced community colleges as an integral part of its higher education system and as a result,

its community colleges are relatively undeveloped as an educational resource.[22] Louisiana ranks 48th among states in the number of higher education institutions in relation to college age population largely because of the paucity of community colleges. Moreover, community colleges serve a nontraditional age population largely unserved in Louisiana, even though Louisiana has a very low high school completion rate which accentuates the need for lifelong learning. Community colleges are also necessary to insure remedial education of those who might be excluded from the less accessible four-year college system, thereby helping to ensure a racially balanced system.[23] A system created from among the existing independent community colleges would have had 12,351 students in 1988, of whom 31 percent were black.[24]

The Special Master expressed trepidation in reclassifying SUNO, with its extraordinarily low productivity as a four-year liberal arts university.[25] Nevertheless, SUNO's two-year role has been no more successful than its four-year mission. Moreover, SUNO's two-year offerings overlap with Delgado's, whereas SUNO will be the only open admissions four-year university in New Orleans, once UNO adopts selective admissions. If the re-orientation is conscientiously pursued by the board and the SUNO administration, creating this new niche for SUNO may lead to improved

---

19. *See id.* at p. 72. Given that almost 50 percent of the entering students need remedial (developmental) education, degree productivity will not be high. *See id.* at p. 75 & n. 17, citing Tremblay Hearing Exhibit 2, which shows that 48 percent of fall 1988 four-year college students needed developmental education. The figure was 77 percent for black students. Interestingly the percentage of those needing developmental education was also 48 percent for students at two-year colleges, suggesting that four-year schools provide as much if not more remedial education than two-year schools. This also points to a hidden cost of the open admissions system which fails to organize students by academic ability. It creates program inefficiencies since all of higher education must devote resources to developmental education.

20. See pp. 505–506, *supra* and Tremblay Chart.

21. Four community colleges are defendants in this case: Delgado (New Orleans); LSU–Eunice; LSU–Alexandria; and Southern–Shreveport. Their total enrollment is about 12,000 students of whom about 3,800 or 32 percent are black.

22. *See* Report, pp. 82–83.

23. *See id.* at p. 84.

24. *Id.*

25. *See id.* at pp. 89–90.

degree productivity. The new board should, therefore, review SUNO's two-year degree offerings and either terminate them or transfer them to Delgado.

Against this background, the new system of higher education proposed by the Special Master and adopted by the Panel may be diagrammed as follows:[26]

26. *See id.,* pp. 91–92.

Organization of Proposed University of Louisiana System

The minimization of program duplication is an essential aspect of the Special Master's proposed reorganization of the school system. The evidence demonstrates there is more program duplication in Louisiana than is desirable from the point of view of educational efficiency.[27] Dr. McTarnaghan shows how Louisiana has more degree programs in many areas than does Florida, even though Florida is a much larger system and state.[28]

McTarnaghan attributes much of this program duplication to the lack of a single board with adequate authority to initiate or terminate programs. He notes excessive duplication costs money and renders the programs less viable from a qualitative perspective. Moreover, McTarnaghan also suggests duplication permits schools to cater to students of one race, thereby hindering desegregation goals. Other witnesses, notably Clifton Conrad,[29] confirm program duplication is excessive in Louisiana and that it fosters racially identifiable schools.[30]

There is accordingly no doubt in the Court's mind that duplication of programs can have a stultifying effect on desegregation. Therefore, the board must take as one of its first missions the reduction of duplicated programs, especially where they involve proximate institutions.[31]

In cataloguing the problems associated with unwarranted duplication of programs, legal education in Louisiana looms large. There are two state supported law schools in Louisiana, Southern Law Center and the LSU Paul Hebert Law Center, both located in Baton Rouge. In terms of racial identifiability and academic achievement, they present remarkably different pictures.

Southern Law Center is desegregated, with a student body 58 percent black and 42 percent white and a faculty (including part-time) which is virtually 50/50. LSU Law Center on the other hand has a minuscule percentage of black students. During the period of the consent decree, it ranged from 1.9 percent to 0.8 percent. In 1988, it was only three percent.[32] Moreover, the Louisiana bar passage rate at LSU Law Center has averaged about 90 percent over the last five years, whereas at Southern Law Center it is under 50 percent. LSU Law School is a more successful law school from that perspective,[33] but Louisiana blacks are largely educated at the inferior school. Yet, competitive, quality legal education for blacks is particularly important because the ratio of black lawyers to the black population is very low, and law degrees are often recognized as an access point to political and economic power.[34]

Thus, the Panel perceives the focal issue concerning legal education to be different from the issue identified by the Special Master.[35] The issue is how to desegregate legal education overall, not just LSU. Unlike the other Louisiana institutions, the two law schools have identical programs and exist virtually side by side. Moreover, the programmatic difficulties of institutional merger in the university context generally are greatly lessened in this instance since both institutions award only a single degree (J.D.).

LSU Law Center's low percentage of blacks seems to be a function of an admissions policy that makes no effort to attract black applicants, since it is significantly below the percentage of black undergradu-

**27.** *See id.* at, p. 93.

**28.** *See* chart in note 8, p. 508, *supra.*

**29.** Conrad testified on behalf of the United States. He is a Professor of higher education at the University of Wisconsin.

**30.** See Report, p. 94 & n. 25.

**31.** *See* Report, p. 95. To some extent, this assignment is tied to the tiering proposal the board must also implement. However, tiering involved primarily graduate level programs and much of the duplication currently exists at the undergraduate level. (*See* McTarnaghan table in note 8 *supra.*) In terms of the desegregation data in this case, undergraduates are a critical aspect. The number of students involved is far larger and the impact of enrollment choice is likely to be more pronounced.

**32.** *See* Report, p. 96.

**33.** *See id.* at p. 97.

**34.** *See id.* at p. 96.

**35.** See *id.* at p. 96.

ates at LSU–A & M and the number of blacks at the state's two private law schools.[36] Moreover, those few blacks who do graduate from LSU Law School succeed in passing the bar (of the eighteen black students at LSU since 1982–83, none has failed the bar). Affirmative action programs setting goals like the new admissions standards at LSU–A & M are an appropriate place to begin the desegregation of legal education. A ten percent category of admissions exceptions whose purpose is to increase the diversity of LSU Law School and the number of black graduates is appropriate and should be immediately implemented for the 1990–91 school year. LSU should also offer substantial scholarships to black students and undertake vigorous recruitment efforts aimed at black students.

However, as long as the two institutions of disparate quality exist, the State will continue to produce a secondary class of lawyers unable to compete fully in the professional context. Given the racial composition of the two schools, the negative impact of this disparity will fall largely upon the black law student population, and given the consent decree experience, a simple provision of funds will not resolve this problem, even assuming such funding is a realistic possibility.

Thus, over the next five years, the Board must develop a plan for merger of the two schools; a gradual merger over a five year period of time will minimize the necessary adjustment by the students, administration, and faculty and the impact of curriculum change. Duplication of programs should be gradually eliminated and new admissions standards for the single Law Center evaluated, with continuing provision for a special category of admissions at no lower than ten percent. New admissions standards should also be prepared with a view towards ensuring that the merger of the two institutions does not disproportionately burden the black law student population, even though the Panel envisions the imposition of more stringent admissions stan-

dards at the new merged law school than are presently imposed at Southern.

▪ The Court also declines to adopt as a remedy any order that specific dollar amounts of operating expenses or capital to be spent on enhancement of existing institutions.[37] Nonetheless, the new board must make provision for such funding as is necessary to implement the program transfers ordered herein and any other new programs the single board orders, whether such funding be referred to as "enhancement," as the Special Master stated, or otherwise. Determination of specific dollar amounts requires carefully drawn budgets not made a part of the record in these proceedings. The president of the system and his or her staff must calculate the funds needed for operating purposes and expend them properly.

▪ Since the necessity for higher education budget cuts has yet to be determined, the most that need be said now is that all cuts as well as increases must be made consistent with the desegregation goals of this plan. At a minimum, funding reductions should not disproportionately affect black students or the PBIs and existing funding for those PBI enhancement programs successful in attracting substantial other race students should be protected from budgetary ax.[38]

A final remedial measure recommended by the Master and adopted by the Court is monitoring of the actions taken by the state to implement this Order. The need for a monitoring function is premised largely upon the Court's continuing jurisdiction over this case, and some form of monitoring is necessary to aid the Court in the exercise of its jurisdiction. The remedies discussed herein place most of the responsibility for compliance upon the state and its institutions, where responsibility should lie if desegregation is to become a reality for Louisiana. The single board and its chief executive are given extensive powers to end the racial identifiability of Louisiana

36. *See id.* at pp. 97–98.

37. *See id.,* pp. 104–05.

38. *See id.,* p. 107.

higher education. At the same time, of necessity much of the impact of this remedy is to be felt in the future. Thus, it is difficult to argue that the system should be released from oversight by the Court at this stage. A period of review, over five years, is the only prudent way to assure the implementation of the remedies proposed.[39]

Thus, pursuant to the Special Master's Final Report as modified above and consistent with the Court's prior orders, it is specifically ORDERED as follows:

### Single Governing Board

■ 1. Within 30 days of the entry of this Order, the four boards currently governing public higher education in Louisiana shall be disbanded and their powers consolidated into a single state governing board. The new board ("board") shall be given ultimate authority over academic, budgetary, personnel and administrative affairs of each of the public institutions currently overseen by the Board of Trustees, the Southern Supervisors and the LSU Supervisors. Additionally, the board shall be given the special mission of monitoring and implementing the remedial Order of the Court and of insuring that progress toward eliminating Louisiana's racially dual education system is achieved. The board shall determine an appropriate name for the new coordinated system of higher education, such as the "University of Louisiana System."[40]

2. The board shall have seventeen voting members and one student member. The board shall elect a chair from among its members on an annual basis. The voting members shall be appointed by the Governor and confirmed by the Louisiana Senate.

Board members shall have staggered terms of five years and reappointment for one additional term shall be permitted.

The initial terms shall be for three, four or five years in order to permit the staggered system to begin. These terms shall apply to six, six and five members, respectively.

The board members appointed pursuant to this Order shall include three persons chosen from the present Board of Regents, with one person to hold a three year appointment, one a four year appointment and one a five year appointment; two persons chosen from the present LSU Board of Supervisors, with one person to hold a four year appointment and one person to hold a five year appointment; two persons chosen from the present Southern Board of Supervisors, with one person to hold a four year appointment and one person to hold a five year appointment; and two. persons chosen from the present Board of Trustees, with one person to hold a four year appointment and one person to hold a five year appointment.[41]

In making appointments to the board, the Governor shall not only select persons with established skills and experience in higher education, but shall also select persons firmly committed to the desegregation goals of the Court's Order and the Court's methods for implementing the Order. Additionally, board members shall be selected to broadly represent the racial, ethnic, gender and geographic diversity of the state.

■ 3. For the first five years, while the remedial provisions of the Court's Order are being implemented, the Court shall reserve the right to veto the composition of the board, if the board's composition does not adequately take into consideration the goals of this Order or does not work to ensure participation by Louisiana's black citizens. In addition, the board shall appoint one student member on an annual basis, pursuant to a procedure established by the board. A black student frequently should be appointed.

---

**39.** *See id.*, p. 112.

**40.** The names and titles used in this order are only suggestions; the board is free to craft different names or titles so long as they are otherwise consistent with the remedial goals of this plan.

**41.** Once these appointments are made, there will remain five more members to be appointed for three year terms; two more members to be appointed for four year terms; and one more member to be appointed for a five year term.

4. The board shall be charged with appointing a full-time president. This person shall have an established and extensive background in higher education governance, and a sensitivity to the educational needs of racial minorities. The president shall serve at the pleasure of the board and be delegated operational authority over the university system.

5. There shall be a substantial administrative staff to support the new president, which will utilize the personnel and resources of the Board of Regents and the three operating boards, as appropriate. The president shall have the responsibility to recommend to the board appointment and, if necessary, removal of chancellors of each of the system campuses. Additionally, a special vice-president for desegregation compliance, whose mission is to oversee implementation of the Court's plan, shall be appointed by the board upon the recommendation of the president. This special vice-president shall be responsible for developing and implementing other desegregation proposals approved by the board; for compiling data on all aspects of desegregation in Louisiana public higher education; and for reporting to the monitoring committee as hereinafter required.

6. Within 90 days after the entry of this Order, the board shall develop and implement procedures for the use of advisory committees at each state university and community college. Among their duties, these committees shall provide advice and assistance to the president and the vice-president for desegregation compliance, as requested. The size of these advisory committees shall be set by the board but shall not exceed 17 members. All state universities shall be encouraged to form such committees which will provide non-binding advice and information about campus life to the board. Like the board, these advisory committees shall be appropriately composed to further the goals of this Order.

*Classification of State Universities*

7. Within 120 days, the board shall implement a scheme for classifying each state university according to its mission and taking into account its undergraduate, graduate and research programs and the degree of selectivity in admissions. Such classifications shall be consistent with the tiers set forth below and shall be designed to reduce the number of programs statewide. The board shall be especially careful to differentiate the missions and academic programs of proximate PWIs and PBIs.

8. LSU A & M shall be designated by the board as the research university in the state university system and recognized as Louisiana's flagship state institution. It shall continue to have the greatest number of graduate and research programs and shall implement the most selective criteria for admission. LSU A & M's undergraduate admissions shall be limited to the top echelon of graduating high school seniors in light of standards established by the board, with selectivity based on criteria discussed below. These selective admissions standards shall be established within 120 days and implemented for the 1990–1991 school year. All remedial education courses shall be eliminated by the 1990–1991 school year.

9. The board shall also designate an intermediate level of state institutions offering significant doctoral and other graduate programs in addition to four-year undergraduate programs. These universities shall be somewhat less selective than LSU A & M, based on criteria discussed below. The selectivity standards shall be developed within 120 days and implemented for the 1990–1991 school year. Like LSU A & M, this group of universities shall have little need for, and thus by the 1993–1994 school year, no remedial education courses. The group of intermediate doctoral institutions shall initially be Louisiana Tech, SUBR, UNO and USL. The board shall be responsible for developing a realistic timetable for SUBR, with the imposition of selective admissions and the development of its doctoral level programs taking no more than three years.

10. The board shall designate the remaining four-year public institutions—Grambling, Nicholls, SUNO, LSU–Shreveport, McNeese, Northeast, Northwestern

and Southeastern—as comprehensive universities which will have very limited graduate/research missions and less selective or open admissions. The new board shall within 120 days set the admissions standards for all of these institutions with the exception of Grambling, which standards shall be implemented for the 1990–1991 school year. Care shall be taken to insure that at least some of these institutions move away from open admissions toward some degree of selectivity (which might be the requirement of completing a college preparatory curriculum).

11. With respect to admissions standards for Grambling and Louisiana Tech, the Court hereby adopts as part of its Order the stipulation of the parties appearing as Appendix B to the Special Master's Final Report, but only to the extent such stipulation and its implementation are consistent with this Opinion and Order.

■■■ 12. Within 180 days, existing graduate programs at comprehensive universities should be evaluated for continuance. So long as they are educationally sound and foster the desegregation goals of this Order, some discrete, non-duplicative graduate programs may be maintained.[42] Comprehensive universities may retain remedial education programs, especially if they remain open admissions institutions. However, the primary focus for remedial education shall be shifted in the future to the community colleges, which will be solely open admissions institutions.

*Selective Admissions Standards*

■■■ 13. The state shall end the traditional system of open admissions to all state universities. Consistent with the classification scheme laid out above, selective admissions requirements shall be developed by the board within 120 days and implemented at selected Louisiana public universities by the 1990–1991 school year. Only five institutions are made selective directly under this Order (and one of them, SUBR, only after three years). The board has discretion to make further selectivity distinctions with the remaining institutions,

so long as the admissions standards of the five selective schools designated herein clearly distinguish them from the remaining institutions.

14. State universities shall base admission decisions on some combination of high school grades, high school class rank, high school courses taken, personal recommendations, extracurricular activities, essays or personal statements, interviews and standardized test scores. The precise formulation of the criteria for each institution shall be approved by the new board. ACT and other standardized test scores provide valuable data. However, they should be used as admissions tools only in conjunction with other high school performance data. Primary emphasis shall be placed on high school grades, class rank and breadth of course work undertaken.

15. Within 120 days, the board shall develop appropriate programs of high school course work that will be required for admission at each institution. In developing these requirements, the board must consult and work with the Board of Elementary and Secondary Education and the state's high schools to insure that resources are put in place to meet demand. New course work requirements must be phased in commencing with the 1990–1991 school year to allow high schools and students a period to adjust and shall be fully implemented by the 1993–1994 school year.

■■■ 16. Each state institution shall have fifteen percent of its entering class set aside for admissions exceptions. Initially, ten percent shall be used for admitting other race students (that is, black students at PWIs and white students at PBIs), with the remainder available for other institutional interest students such as athletes, students with other talents and alumni children. The precise mechanism for administering the admissions exceptions shall be developed by the president and the campus chancellors but the emphasis shall be fostering integration at each campus. Like selective admissions standards themselves, the admissions exceptions shall be devel-

---

42. See, e.g., n. 16, *supra* p. 509.

oped within 120 days and implemented for the 1990–1991 school year. The use of a ten percent other race set-aside does not mean that overall ten percent other race enrollment is acceptable. The goal is that each campus substantially increase its proportion of other race students and thus eliminate its racial identifiability; this goal demands more than ten percent other race enrollment.

### Comprehensive Community College System

17. The two-year community colleges subject to the Court's Order (LSU–Eunice, LSU–Alexandria, SU–Shreveport/Bossier City and Delgado) shall be reorganized as part of a single comprehensive community college system for Louisiana. The plan for this reorganization shall be completed within 180 days so that the community college system shall be in place by the 1990–1991 school year. All two-year community colleges and vocational schools (including, for example, Bossier Parish Community College and St. Bernard Parish Community College) should be incorporated into this system. The board shall also develop an appropriate name for the new system, such as "Louisiana Southern Community College System."

18. Upon recommendation of the president, the board shall appoint a special vice-president for the community college system who will report to the board through the president. This appointment shall be made within 90 days. The special vice president shall oversee and coordinate the affairs of all community colleges, including the appointment of chancellors at each campus.

19. The community college system vice-president and the president shall insure that, within 180 days, articulation agreements are executed between each of the community colleges and the four-year institutions for the 1990–1991 school year. Such agreements shall be widely advertised and shall provide for transfer of students successfully completing two-year academic degrees, although four-year institutions with selective admissions may adopt selectivity standards in admitting transfer students. The community college system shall also provide vocational and technical education and adult education, but its transfer mission, especially as it relates to minority opportunities, shall be the focus of its efforts at the outset.

20. Community colleges shall retain open admissions standards and shall emphasize remedial education courses. By the 1993–1994 school year, the board shall concentrate remedial education courses in the community colleges, with no remedial courses remaining at four-year universities, with the exception of those comprehensive universities that retain open admissions.[43]

21. By the 1990–1991 school year, the remaining two-year programs at SUNO shall be transferred to Delgado leaving SUNO as the comprehensive four-year institution in New Orleans, with less selective or open admissions. The board shall study whether Delgado's offerings currently meet the demand for community college education in New Orleans and increase Delgado's offerings as needed. Within 180 days the board shall review two-year course offerings at other four-year institutions to determine whether they should be continued or transferred.

22. The board shall study the need for and feasibility of starting new community colleges in the areas of the state where none currently exist. Special attention must be given to Baton Rouge, where a community college will be needed to service local students not able to be admitted at LSU A & M and SUBR, once both have selective admissions. The board shall therefore begin planning for a new college campus in Baton Rouge within the first year.

### Program Transfer and Enrollment Management

23. With the exception of LSU Law Center and Southern Law Center, merger and/or closing of existing state uni-

---

**43.** See, para. 12 of Order, p. 517, *supra.*

versities need not be undertaken at this time. Instead, the board shall implement a system of enrollment management, program review and program transfer to address the problem of program duplication and accompanying waste of resources and segregation. The board shall assign to the president the mission of reviewing all current course offerings. Within 180 days, the president shall recommend appropriate enrollment levels for each academic program and also identify programs not meeting minimal quality standards and recommend that they be eliminated or consolidated with similar programs at other state universities.

24. The board shall then take appropriate action with respect to eliminating, consolidating and setting enrollment levels for academic programs, which shall be implemented by the 1990–1991 school year. The board shall ensure that such action is sensitive to the desegregation goals of this plan. Thus enrollment limits shall be set with an eye toward preventing "flight" of students to same race schools. As an example, enrollment limits at Southeastern shall be used to prevent Southeastern from becoming a "flight" school for white students not gaining admission to LSU A & M or UNO, but who are reluctant to go to SUBR or SUNO.

25. The program transfers agreed upon by Louisiana Tech and Grambling shall be implemented by the 1990–1991 school year. Like other programs, however, these programs are subject to further evaluation by the board and the monitoring committee, and since the Special Master no longer has jurisdiction over this case, any changes in the stipulation's proposals shall be submitted to the board. The details of the Louisiana Tech/Grambling transfers are contained in the stipulation attached as Appendix B to the Special Master's Final Report, which provisions the Court adopts as part of its Order, to the extent such provisions and their implementation are consistent with this Order.

26. By the 1990–1991 school year, the board shall begin implementing the merger

of Southern Law Center into the LSU Law Center. To the extent consistent with the required core curriculum at each law school, the board shall immediately insure that certain high demand course offerings are not duplicated between the State's two public law schools. LSU Law School shall undertake as soon as practicable, but no later than the 1990–1991 school year, vigorous efforts for recruiting blacks, including ten percent admissions exceptions for black students, offering scholarships to prospective black students and appointing a special admissions officer for black students, as described above in this Order.[44]

In implementing this merger, the board shall appoint a chancellor for the new unified Law Center by the 1990–1991 school year who shall work with the board to effectuate merger of faculty and curriculum and re-evaluation of existing admissions standards. In so doing, it is not the intent of this Order to damage the quality of legal education at the LSU Law Center; to require significant lowering of admissions standards; or to require any lowering of academic requirements for those students who do gain admission.

### Funding for Implementation of this Order

 27. Taking into consideration funds freed by the elimination of duplicative programs, the board, in conjunction with the president and staff, shall develop budgets for the newly reclassified institutions, including non-formula expenditures for improving the quality of PBIs whenever fiscally possible. Capital needs shall be evaluated on a similar basis and priority given to those facilities that will support programs to attract other race students. The board shall complete this task within 180 days in conjunction with the 1990–1991 higher education budget submissions.

### Other Race Recruitment and Retention

 28. The board shall develop a coordinated program for recruitment and retention of other race students, faculty,

**44.** See text, pp. 513–14, *supra.*

administrators and staff at all state universities and professional schools within 120 days, which shall include:

(a) Scholarships for other race students. A program of scholarships designed to attract other race students to both PWIs and PBIs shall be developed by the board. A fixed percentage of each institution's overall operating budget shall be set aside for this purpose by the board upon recommendation of the president. Moreover, the board shall establish a state-wide other race scholarship program.

(b) Other race admissions officers. Each PWI and PBI shall have at least one admissions officer whose sole function is to recruit other race students. Such person shall be charged with developing, coordinating and executing all of the institution's other race student recruitment programs.

(c) Equal opportunity statements. Each institution shall develop a strong, written equal opportunity policy, both as to students and employees. This policy shall be reviewed by the special vice-president for desegregation compliance and approved by the board.

(d) Public information efforts. Under the direction of the board, each affected institution shall develop and implement significant campaigns for disseminating to prospective students and employees information about each state university, its programs and its equal opportunity policy. Among other things, public information efforts shall include the use of biracial recruiting teams from each PBI and PWI which shall visit high schools in their region and throughout the state, as appropriate.

(e) Developing relationships between high schools and colleges. The board shall identify state institutions particularly situated to benefit from special outreach programs to high schools in predominantly other race areas. Such programs shall be designed to reduce the strangeness and alienation students often associate with other race institutions. Programs shall include summer sessions in which high school students live on campus and are familiarized with a university's programs and facilities. A pilot project shall be commenced at Southeastern for the summer of 1990.

(f) Incentives. The board shall set annual integration progress goals for each institution which are demanding yet realistic, and which require roughly equivalent progress at each institution. The board shall develop financial incentives for institutions that meet or exceed their annual goals. Financial rewards might include additional funds for scholarships or approval for new program offerings. Incentives shall increase by the degree to which the goal is exceeded. The board shall also consider employing "reverse incentives" or taxes for institutions which consistently fail to meet their goals.

### Monitoring Committee

29. A three-member committee shall monitor progress toward desegregation. The committee shall consist of (1) Paul W. Murrill; (2) Frank E. Vandiver; and (3) Franklyn G. Jenifer. Committee members shall be paid a reasonable per diem and expenses, with Dr. Murrill and Dr. Vandiver's per diem and expenses to be taxed as costs against the State of Louisiana to be allocated to the budgets of the various institutions as the new board deems appropriate. Dr. Jenifer's per diem and expenses will be paid by the United States.

30. The monitoring committee is hereby charged with independently evaluating the progress of the new board and each institution towards specific compliance with this Order and with the overriding desegregation goals set by this Order. Copies of the minutes of all meetings of the new board shall be sent to the members of the monitoring committee within one week of each board meeting. The committee shall meet with the new board at least four times per year, and within one week after each meeting of the board and the committee, the committee shall file a Report to the Panel. The first meeting of the new board and the committee shall take place within 90 days of the appointment of the new board.

The committee's reports shall specifically advise the Panel of the progress or lack of progress towards achieving desegregation. Each member shall have access to the Court at all times, provided such person communicate to the Court in writing, file a copy of any such communication in the record of these proceedings, and send a copy of any such communication to the other committee members.

At least in the early stages of implementation, the monitoring committee shall be available to review and respond to decisions of the new board on an as-needed basis.

31. The monitoring committee shall give the new board a period of five years to achieve substantial progress toward eliminating the racial identifiability of Louisiana's universities. If at the end of five years substantial progress is not shown, the committee shall recommend to the Court more direct solutions, including Court appointment of board members or direct control by the committee of the system of higher education and merger of institutions. However, nothing stated herein shall be construed as a divestiture of this Court's continuing jurisdiction to take appropriate action to enforce this Order.

*Interim Procedures*

32. As previously indicated, the board shall be appointed and confirmed within 30 days of the entry of this Order. As each board member is appointed, the Panel shall be advised of such appointment by letter and shall be provided with a copy of such person's curriculum vitae.

▮ If after 20 days from the entry of this Order the Governor foresees that all board members will not be appointed and confirmed within 30 days, the Governor shall submit to the Court a proposed timetable for completing the board selection process under the guidance of the monitoring committee. If the committee deems it necessary, it may recommend to the Court names of members to serve on the board. The Court reserves the right to make any appointments necessary to complete the composition of the board in a timely fash-ion or to veto the appointment of any board member.

33. The board shall assume responsibility for managing the state university system and implementing this remedial Order as soon as it is formed. While its first responsibility is to search for and appoint a system president, the board should immediately appoint an interim president. The interim president shall serve until the president is selected, in order to insure that centralization of control occurs forthwith and that the steps to be taken during the first year of the Order are not delayed. The board should have the full authority of the state, through the Governor and other state officials, to carry out its mandate. Any questions that arise during the interim period regarding implementation of this plan may be directed to the monitoring committee and by the committee to the Court, if necessary.