# UNITED STATES *v.* FORDICE, GOVERNOR OF MISSISSIPPI, ET AL.

No. 90–1205.   Argued November 13, 1991—Decided June 26, 1992*

---

*Together with No. 90–6588, *Ayers et al.* v. *Fordice, Governor of Mississippi, et al.*, also on certiorari to the same court.

718

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ., joined. O'CONNOR, J., *post*, p. 743, and THOMAS, J., *post*, p. 745, filed concurring opinions. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 749.

*Solicitor General Starr* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Roger Clegg* and *Barbara S. Drake, Deputy Assistant Attorneys General,* and *Jeffrey P. Minear. Alvin O. Chambliss, Jr.,* argued the cause for petitioners in No. 90-6588. With him on the briefs were *Lawrence Young* and *Robert Pressman.*

*William F. Goodman, Jr.,* argued the cause for respondents in both cases. With him on the brief were *Mike Moore,* Attorney General of Mississippi, and *Paul H. Stephenson III* and *William F. Ray,* Special Assistant Attorneys General.†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Tennessee by *Charles W. Burson,* Attorney General of Tennessee, *John Knox Walkup,* Solicitor General, and *Christine Modisher,* Assistant Attorney General; for Alcorn State University by *Gilbert Kujovich;* for Jackson State University by *Deborah McDonald* and *Carrol Rhodes;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers, Charles Stephen Ralston, Norman J. Chachkin, John W. Garland, Janell M. Byrd,* and *John A. Powell;* and for the National Bar Association et al. by *J. Clay Smith, Jr.,* and *Herbert O. Reid, Sr.*

Briefs of *amici curiae* urging affirmance were filed for the Board of Trustees of the University of Alabama by *C. Glenn Powell* and *Stanley J.*

JUSTICE WHITE delivered the opinion of the Court.

In 1954, this Court held that the concept of " 'separate but equal' " has no place in the field of public education. *Brown v. Board of Education,* 347 U. S. 483, 495 *(Brown I).* The following year, the Court ordered an end to segregated public education "with all deliberate speed." *Brown v. Board of Education,* 349 U. S. 294, 301 (1955) *(Brown II).* Since these decisions, the Court has had many occasions to evaluate whether a public school district has met its affirmative obligation to dismantle its prior *de jure* segregated system in elementary and secondary schools. In these cases we decide what standards to apply in determining whether the State of Mississippi has met this obligation in the university context.

## I

Mississippi launched its public university system in 1848 by establishing the University of Mississippi, an institution dedicated to the higher education exclusively of white persons. In succeeding decades, the State erected additional postsecondary, single-race educational facilities. Alcorn State University opened its doors in 1871 as "an agricultural college for the education of Mississippi's black youth." *Ayers v. Allain,* 674 F. Supp. 1523, 1527 (ND Miss. 1987). Creation of four more exclusively white institutions followed: Mississippi State University (1880), Mississippi University for Women (1885), University of Southern Mississippi (1912), and Delta State University (1925). The State added two more solely black institutions in 1940 and 1950: in the former year, Jackson State University, which was charged with training "black teachers for the black public schools," *id.,* at 1528; and in the latter year, Mississippi Valley State Univer-

*Murphy;* and for Charles E. "Buddy" Roemer III, Governor of the State of Louisiana, et al. by *John N. Kennedy, Joseph J. Levin, Jr., Margaret E. Woodward,* and *W. Shelby McKenzie.*

*Joseph A. Califano, Jr., pro se,* and *David S. Tatel* filed a brief of *amicus curiae* for Joseph A. Califano, Jr., et al.

sity, whose functions were to educate teachers primarily for rural and elementary schools and to provide vocational instruction to black students.

Despite this Court's decisions in *Brown I* and *Brown II*, Mississippi's policy of *de jure* segregation continued. The first black student was not admitted to the University of Mississippi until 1962, and then only by court order. See *Meredith* v. *Fair*, 306 F. 2d 374 (CA5), cert. denied, 371 U. S. 828, enf'd, 313 F. 2d 532 (1962) (en banc) *(per curiam)*. For the next 12 years the segregated public university system in the State remained largely intact. Mississippi State University, Mississippi University for Women, University of Southern Mississippi, and Delta State University each admitted at least one black student during these years, but the student composition of these institutions was still almost completely white. During this period, Jackson State and Mississippi Valley State were exclusively black; Alcorn State had admitted five white students by 1968.

In 1969, the United States Department of Health, Education and Welfare (HEW) initiated efforts to enforce Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d.[1] HEW requested that the State devise a plan to disestablish the formerly *de jure* segregated university system. In June 1973, the Board of Trustees of State Institutions of Higher Learning (Board) submitted a plan of compliance, which expressed the aims of improving educational opportunities for all Mississippi citizens by setting numerical goals on the enrollment of other-race students at state universities, hiring other-race faculty members, and instituting remedial programs and special recruitment efforts to achieve those goals. App. 898–900. HEW rejected this Plan as failing to comply with Title VI because it did not go far enough in the areas of student

---

[1] This provision states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

recruitment and enrollment, faculty hiring, elimination of unnecessary program duplication, and institutional funding practices to ensure that "a student's choice of institution or campus, henceforth, will be based on other than racial criteria." *Id.*, at 205. The Board reluctantly offered amendments, prefacing its reform pledge to HEW with this statement: "With deference, it is the position of the Board of Trustees . . . that the Mississippi system of higher education is in compliance with Title VI of the Civil Rights Act of 1964." *Id.*, at 898. At this time, the racial composition of the State's universities had changed only marginally from the levels of 1968, which were almost exclusively single race.[2] Though HEW refused to accept the modified Plan, the Board adopted it anyway. 674 F. Supp., at 1530. But even the limited effects of this Plan in disestablishing the prior *de jure* segregated system were substantially constricted by the state legislature, which refused to fund it until fiscal year 1978, and even then at well under half the amount sought by the Board. App. 896–897, 1444–1445, 1448–1449.[3]

Private petitioners initiated this lawsuit in 1975. They complained that Mississippi had maintained the racially segregative effects of its prior dual system of postsecondary education in violation of the Fifth, Ninth, Thirteenth, and Fourteenth Amendments, 42 U. S. C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d.

---

[2] For the 1974–1975 school year, black students comprised 4.1 percent of the full-time undergraduate enrollments at University of Mississippi; at Mississippi State University, 7.5 percent; at University of Southern Mississippi, 8.0 percent; at Delta State University, 12.6 percent; at Mississippi University for Women, 13.0 percent. At Jackson State, Alcorn State, and Mississippi Valley State, the percentages of black students were 96.6 percent, 99.9 percent, and 100 percent, respectively. Brief for United States 7.

[3] According to counsel for respondents, it was in this time period—the mid- to late-1970's—that the State came into full "compliance with the law" as having taken the necessary affirmative steps to dismantle its prior *de jure* system. Tr. of Oral Arg. 45.

Shortly thereafter, the United States filed its complaint in intervention, charging that state officials had failed to satisfy their obligation under the Equal Protection Clause of the Fourteenth Amendment and Title VI to dismantle Mississippi's dual system of higher education.

After this lawsuit was filed, the parties attempted for 12 years to achieve a consensual resolution of their differences through voluntary dismantlement by the State of its prior separated system. The board of trustees implemented reviews of existing curricula and program "mission" at each institution. In 1981, the Board issued "Mission Statements" that identified the extant purpose of each public university. These "missions" were clustered into three categories: comprehensive, urban, and regional. "Comprehensive" universities were classified as those with the greatest existing resources and program offerings. All three such institutions (University of Mississippi, Mississippi State, and Southern Mississippi) were exclusively white under the prior *de jure* segregated system. The Board authorized each to continue offering doctoral degrees and to assert leadership in certain disciplines. Jackson State, the sole urban university, was assigned a more limited research and degree mission, with both functions geared toward its urban setting. It was exclusively black at its inception. The "regional" designation was something of a misnomer, as the Board envisioned those institutions primarily in an undergraduate role, rather than a "regional" one in the geographical sense of serving just the localities in which they were based. Only the universities classified as "regional" included institutions that, prior to desegregation, had been either exclusively white—Delta State and Mississippi University for Women—or exclusively black—Alcorn State and Mississippi Valley State.

By the mid-1980's, 30 years after *Brown*, more than 99 percent of Mississippi's white students were enrolled at University of Mississippi, Mississippi State, Southern Mississippi, Delta State, and Mississippi University for Women.

The student bodies at these universities remained predominantly white, averaging between 80 and 91 percent white students. Seventy-one percent of the State's black students attended Jackson State, Alcorn State, and Mississippi Valley State, where the racial composition ranged from 92 to 99 percent black. *Ayers* v. *Allain,* 893 F. 2d 732, 734–735 (CA5 1990) (panel decision).

## II

By 1987, the parties concluded that they could not agree on whether the State had taken the requisite affirmative steps to dismantle its prior *de jure* segregated system. They proceeded to trial. Both sides presented voluminous evidence on a full range of educational issues spanning admissions standards, faculty and administrative staff recruitment, program duplication, on-campus discrimination, institutional funding disparities, and satellite campuses. Petitioners argued that in various ways the State continued to reinforce historic, race-based distinctions among the universities. Respondents argued generally that the State had fulfilled its duty to disestablish its state-imposed segregative system by implementing and maintaining good-faith, nondiscriminatory race-neutral policies and practices in student admission, faculty hiring, and operations. Moreover, they suggested, the State had attracted significant numbers of qualified black students to those universities composed mostly of white persons. Respondents averred that the mere continued existence of racially identifiable universities was not unlawful given the freedom of students to choose which institution to attend and the varying objectives and features of the State's universities.

At trial's end, based on the testimony of 71 witnesses and 56,700 pages of exhibits, the District Court entered extensive findings of fact. The court first offered a historical overview of the higher education institutions in Mississippi and the developments in the system between 1954 and the filing of this suit in 1975. 674 F. Supp., at 1526–1530. It

then made specific findings recounting post-1975 developments, including a description at the time of trial, in those areas of the higher education system under attack by plaintiffs: admission requirements and recruitment; institutional classification and assignment of missions; duplication of programs; facilities and finance; the land grant institutions; faculty and staff; and governance. *Id.*, at 1530–1550.

The court's conclusions of law followed. As an overview, the court outlined the common ground in the action: "Where a state has previously maintained a racially dual system of public education established by law, it assumes an 'affirmative duty' to reform those policies and practices which required or contributed to the separation of races." *Id.*, at 1551. Noting that courts unanimously hold that the affirmative duty to dismantle a racially dual structure in elementary and secondary schools also governs in the higher education context, the court observed that there was disagreement whether *Green v. School Bd. of New Kent County*, 391 U. S. 430 (1968), applied in all of its aspects to formerly dual systems of higher education, *i. e.*, whether "some level of racial mixture at previously segregated institutions of higher learning is not only desirable but necessary to 'effectively' desegregate the system." 674 F. Supp., at 1552. Relying on a Fifth Circuit three-judge court decision, *Alabama State Teachers Assn. (ASTA) v. Alabama Public School and College Authority*, 289 F. Supp. 784 (MD Ala. 1968), our *per curiam* affirmance of that case, 393 U. S. 400 (1969), and its understanding of our later decision in *Bazemore v. Friday*, 478 U. S. 385 (1986), the court concluded that in the higher education context, "the affirmative duty to desegregate does not contemplate either restricting choice or the achievement of any degree of racial balance." 674 F. Supp., at 1553. Thus, the court stated: "While student enrollment and faculty and staff hiring patterns are to be examined, greater emphasis should instead be placed on current state higher education policies and practices in order to insure that such

policies and practices are racially neutral, developed and implemented in good faith, and do not substantially contribute to the continued racial identifiability of individual institutions." *Id.*, at 1554.

When it addressed the same aspects of the university system covered by the findings of fact in light of the foregoing standard, the court found no violation of federal law in any of them. "In summary, the court finds that current actions on the part of the defendants demonstrate conclusively that the defendants are fulfilling their affirmative duty to disestablish the former *de jure* segregated system of higher education." *Id.*, at 1564.

The Court of Appeals reheard the action en banc and affirmed the decision of the District Court. *Ayers* v. *Allain,* 914 F. 2d 676 (CA5 1990). With a single exception, see *infra,* at 741, it did not disturb the District Court's findings of fact or conclusions of law. The en banc majority agreed that "Mississippi was . . . constitutionally required to eliminate invidious racial distinctions and dismantle its dual system." *Id.*, at 682. That duty, the court held, had been discharged since "the record makes clear that Mississippi has adopted and implemented race neutral policies for operating its colleges and universities and that all students have real freedom of choice to attend the college or university they wish . . . ." *Id.*, at 678.

We granted the respective writs of certiorari filed by the United States and the private petitioners. 499 U. S. 958 (1991).

### III

The District Court, the Court of Appeals, and respondents recognize and acknowledge that the State of Mississippi had the constitutional duty to dismantle the dual school system that its laws once mandated. Nor is there any dispute that this obligation applies to its higher education system. If the State has not discharged this duty, it remains in violation of the Fourteenth Amendment. *Brown* v. *Board of Education*

and its progeny clearly mandate this observation. Thus, the primary issue in these cases is whether the State has met its affirmative duty to dismantle its prior dual university system.

Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. Thus we have consistently asked whether existing racial identifiability is attributable to the State, see, *e. g., Freeman* v. *Pitts*, 503 U. S. 467, 496 (1992); *Bazemore* v. *Friday, supra,* at 407 (WHITE, J., concurring); *Pasadena City Bd. of Ed.* v. *Spangler,* 427 U. S. 424, 434 (1976); *Gilmore* v. *City of Montgomery,* 417 U. S. 556, 566–567 (1974); and examined a wide range of factors to determine whether the State has perpetuated its formerly *de jure* segregation in any facet of its institutional system. See, *e. g., Board of Ed. of Oklahoma City Public Schools* v. *Dowell,* 498 U. S. 237, 250 (1991); *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1, 18 (1971); *Green* v. *School Bd. of New Kent County, supra,* at 435–438.

The Court of Appeals concluded that the State had fulfilled its affirmative obligation to disestablish its prior *de jure* segregated system by adopting and implementing race-neutral policies governing its college and university system. Because students seeking higher education had "real freedom" to choose the institution of their choice, the State need do no more. Even though neutral policies and free choice were not enough to dismantle a dual system of primary or secondary schools, *Green* v. *School Bd. of New Kent County,* 391 U. S. 430 (1968), the Court of Appeals thought that universities "differ in character fundamentally" from lower levels of schools, 914 F. 2d, at 686, sufficiently so that our decision in *Bazemore* v. *Friday, supra,* justified the conclusion that the State had dismantled its former dual system.

Like the United States, we do not disagree with the Court of Appeals' observation that a state university system is

quite different in very relevant respects from primary and secondary schools. Unlike attendance at the lower level schools, a student's decision to seek higher education has been a matter of choice. The State historically has not assigned university students to a particular institution. Moreover, like public universities throughout the country, Mississippi's institutions of higher learning are not fungible—they have been designated to perform certain missions. Students who qualify for admission enjoy a range of choices of which institution to attend. Thus, as the Court of Appeals stated, "[i]t hardly needs mention that remedies common to public school desegregation, such as pupil assignments, busing, attendance quotas, and zoning, are unavailable when persons may freely choose whether to pursue an advanced education and, when the choice is made, which of several universities to attend." 914 F. 2d, at 687.

We do not agree with the Court of Appeals or the District Court, however, that the adoption and implementation of race-neutral policies alone suffice to demonstrate that the State has completely abandoned its prior dual system. That college attendance is by choice and not by assignment does not mean that a race-neutral admissions policy cures the constitutional violation of a dual system. In a system based on choice, student attendance is determined not simply by admissions policies, but also by many other factors. Although some of these factors clearly cannot be attributed to state policies, many can be. Thus, even after a State dismantles its segregative *admissions* policy, there may still be state action that is traceable to the State's prior *de jure* segregation and that continues to foster segregation. The Equal Protection Clause is offended by "sophisticated as well as simple-minded modes of discrimination." *Lane* v. *Wilson*, 307 U. S. 268, 275 (1939). If policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices. *Freeman,*

*supra,* at 494; *Dowell, supra,* at 250; *Green, supra,* at 439; *Florida ex rel. Hawkins* v. *Board of Control of Fla.,* 350 U. S. 413, 414 (1956) *(per curiam).*[4] We also disagree with respondents that the Court of Appeals and District Court properly relied on our decision in *Bazemore* v. *Friday,* 478 U. S. 385 (1986). *Bazemore* neither requires nor justifies the conclusions reached by the two courts below.[5]

---

[4] To the extent we understand private petitioners to urge us to focus on present discriminatory effects without addressing whether such consequences flow from policies rooted in the prior system, we reject this position. Private petitioners contend that the State must not only cease its legally authorized discrimination, it must also "eliminate its continuing effects insofar as practicable." Brief for Petitioners in No. 90–6588, p. 44. Though they seem to disavow as radical a remedy as student reassignment in the university setting, *id.,* at 66, their focus on "student enrollment, faculty and staff employment patterns, [and] black citizens' college-going and degree-granting rates," *id.,* at 63, would seemingly compel remedies akin to those upheld in *Green* v. *School Bd. of New Kent County,* 391 U. S. 430 (1968), were we to adopt their legal standard. As will become clear, however, the inappropriateness of remedies adopted in *Green* by no means suggests that the racial identifiability of the institutions in a university system is irrelevant to deciding whether a State such as Mississippi has satisfactorily dismantled its prior *de jure* dual system or that the State need not take additional steps to ameliorate such identifiability.

[5] Similarly, reliance on our *per curiam* affirmance in *Alabama State Teachers Assn.* v. *Alabama Public School and College Authority,* 289 F. Supp. 784 (MD Ala. 1968) *(ASTA),* aff'd, 393 U. S. 400 (1969) *(per curiam),* is misplaced. In *ASTA,* the state teachers association sought to enjoin construction of an extension campus of Auburn University in Montgomery, Alabama. The three-judge District Court rejected the allegation that such a facility would perpetuate the State's dual system. It found that the State had educationally justifiable reasons for this new campus and that it had acted in good faith in the fields of admissions, faculty, and staff. 289 F. Supp., at 789. The court also noted that it was "reasonable to conclude that a new institution will not be a white school or a Negro school, but just a school." *Ibid.* Respondents are incorrect to suppose that *ASTA* validates policies traceable to the *de jure* system regardless of whether or not they are educationally justifiable or can be practicably altered to reduce their segregative effects.

*Bazemore* raised the issue whether the financing and operational assistance provided by a state university's extension service to voluntary 4–H and Homemaker Clubs was inconsistent with the Equal Protection Clause because of the existence of numerous all-white and all-black clubs. Though prior to 1965 the clubs were supported on a segregated basis, the District Court had found that the policy of segregation had been completely abandoned and that no evidence existed of any lingering discrimination in either services or membership; any racial imbalance resulted from the wholly voluntary and unfettered choice of private individuals. *Bazemore, supra,* at 407 (WHITE, J., concurring). In this context, we held inapplicable the *Green* Court's judgment that a voluntary choice program was insufficient to dismantle a *de jure* dual system in public primary and secondary schools, but only after satisfying ourselves that the State had not fostered segregation by playing a part in the decision of which club an individual chose to join.

*Bazemore* plainly does not excuse inquiry into whether Mississippi has left in place certain aspects of its prior dual system that perpetuate the racially segregated higher education system. If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system. Such policies run afoul of the Equal Protection Clause, even though the State has abolished the legal requirement that whites and blacks be educated separately and has established racially neutral policies

not animated by a discriminatory purpose.[6]  Because the standard applied by the District Court did not make these inquiries, we hold that the Court of Appeals erred in affirming the District Court's ruling that the State had brought itself into compliance with the Equal Protection Clause in the operation of its higher education system.[7]

## IV

Had the Court of Appeals applied the correct legal standard, it would have been apparent from the undisturbed fac-

[6] Of course, if challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles. *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 250–251 (1991); *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977).

[7] The Court of Appeals also misanalyzed the Title VI claim.  The court stated that "we are not prepared to say the defendants have failed to meet the duties outlined in the regulations."  914 F. 2d 676, 687–688, n. 11 (CA5 1990).  The court added that it need not "discuss the scope of Mississippi's duty under the regulations" because "the duty outlined by the Supreme Court in *Bazemore* controls in Title VI cases."  *Ibid.*  It will be recalled, however, that the relevant agency and the courts had specifically found no violation of the regulation in *Bazemore* v. *Friday*, 478 U. S. 385, 409 (1986) (WHITE, J., concurring).  Insofar as it failed to perform the same factual inquiry and application as the courts in *Bazemore* had made, therefore, the Court of Appeals' reliance on *Bazemore* to *avoid* conducting a similar analysis in these cases was inappropriate.

Private petitioners reiterate in this Court their assertion that the state system also violates Title VI, citing a regulation to that statute which requires States to "take affirmative action to overcome the effects of prior discrimination." 34 CFR § 100.3(b)(6)(i) (1991).  Our cases make clear, and the parties do not disagree, that the reach of Title VI's protection extends no further than the Fourteenth Amendment.  See *Regents of Univ. of California* v. *Bakke*, 438 U. S. 265, 287 (1978) (opinion of Powell, J.); *id.*, at 328 (opinion of Brennan, WHITE, Marshall, and BLACKMUN, JJ., concurring in judgment in part and dissenting in part); see also *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 463 U. S. 582, 610–611 (1983) (Powell, J., concurring in judgment); *id.*, at 612–613 (O'CONNOR, J., concurring in judgment); *id.*, at 639–643 (STEVENS, J., dissenting).  We thus treat the issues in these cases as they are implicated under the Constitution.

tual findings of the District Court that there are several sur-
viving aspects of Mississippi's prior dual system which are
constitutionally suspect; for even though such policies may
be race neutral on their face, they substantially restrict a
person's choice of which institution to enter, and they con-
tribute to the racial identifiability of the eight public univer-
sities. Mississippi must justify these policies or eliminate
them.

It is important to state at the outset that we make no
effort to identify an exclusive list of unconstitutional rem-
nants of Mississippi's prior *de jure* system. In highlighting,
as we do below, certain remnants of the prior system that
are readily apparent from the findings of fact made by the
District Court and affirmed by the Court of Appeals,[8] we
by no means suggest that the Court of Appeals need not ex-
amine, in light of the proper standard, each of the other poli-
cies now governing the State's university system that have
been challenged or that are challenged on remand in light of
the standard that we articulate today. With this caveat in
mind, we address four policies of the present system: admis-
sions standards, program duplication, institutional mission
assignments, and continued operation of all eight public
universities.

We deal first with the current admissions policies of Mis-
sissippi's public universities. As the District Court found,
the three flagship historically white universities in the sys-

---

[8] In this sense, it is important to reiterate that we do not disturb
the findings of no discriminatory purpose in the many instances in which
the courts below made such conclusions. The private petitioners and the
United States, however, need not show such discriminatory intent to es-
tablish a constitutional violation for the perpetuation of policies traceable
to the prior *de jure* segregative regime which have continuing discrimi-
natory effects. As for present policies that do not have such historical
antecedents, a claim of violation of the Fourteenth Amendment cannot
be made out without a showing of discriminatory purpose. See *supra*, at
732, n. 6.

tem—University of Mississippi, Mississippi State University, and University of Southern Mississippi—enacted policies in 1963 requiring all entrants to achieve a minimum composite score of 15 on the test administered by the American College Testing Program (ACT). 674 F. Supp., at 1531. The court described the "discriminatory taint" of this policy, *id.*, at 1557, an obvious reference to the fact that, at the time, the average ACT score for white students was 18 and the average score for blacks was 7. 893 F. 2d, at 735. The District Court concluded, and the en banc Court of Appeals agreed, that present admissions standards derived from policies enacted in the 1970's to redress the problem of student unpreparedness. 914 F. 2d, at 679; 674 F. Supp., at 1531. Obviously, this midpassage justification for perpetuating a policy enacted originally to discriminate against black students does not make the present admissions standards any less constitutionally suspect.

The present admissions standards are not only traceable to the *de jure* system and were originally adopted for a discriminatory purpose, but they also have present discriminatory effects. Every Mississippi resident under 21 seeking admission to the university system must take the ACT test. Any applicant who scores at least 15 qualifies for automatic admission to any of the five historically white institutions except Mississippi University for Women, which requires a score of 18 for automatic admission unless the student has a 3.0 high school grade average. Those scoring less than 15 but at least 13 automatically qualify to enter Jackson State University, Alcorn State University, and Mississippi Valley State University. Without doubt, these requirements restrict the range of choices of entering students as to which institution they may attend in a way that perpetuates segregation. Those scoring 13 or 14, with some exceptions, are excluded from the five historically white universities and if they want a higher education must go to one of the historically black institutions or attend junior college with the hope

of transferring to a historically white institution.[9]  Proportionately more blacks than whites face this choice: In 1985, 72 percent of Mississippi's white high school seniors achieved an ACT composite score of 15 or better, while less than 30 percent of black high school seniors earned that score.  App. 1524–1525.  It is not surprising then that Mississippi's universities remain predominantly identifiable by race.

The segregative effect of this automatic entrance standard is especially striking in light of the differences in minimum automatic entrance scores among the regional universities in Mississippi's system.  The minimum score for automatic admission to Mississippi University for Women is 18; it is 13 for the historically black universities.  Yet Mississippi University for Women is assigned the same institutional mission as two other regional universities, Alcorn State and Mississippi Valley State—that of providing quality undergraduate education.  The effects of the policy fall disproportionately on black students who might wish to attend Mississippi University for Women; and though the disparate impact is not as great, the same is true of the minimum standard ACT score of 15 at Delta State University—the other "regional" university—as compared to the historically black "regional" universities where a score of 13 suffices for automatic admission.  The courts below made little, if any, effort to justify in educational terms those particular disparities in entrance requirements or to inquire whether it was practicable to eliminate them.

---

[9] The District Court's finding that "[v]ery few black students, if any, are actually denied admission to a Mississippi university as a first-time freshman for failure to achieve the minimal ACT score," *Ayers* v. *Allain*, 674 F. Supp. 1523, 1535 (ND Miss. 1987), ignores the inherent self-selection that accompanies public announcement of "automatic" admissions standards.  It is logical to think that some percentage of black students who fail to score 15 do *not* seek admission to one of the historically white universities because of this automatic admissions standard.

We also find inadequately justified by the courts below or by the record before us the differential admissions requirements between universities with dissimilar programmatic missions. We do not suggest that absent a discriminatory purpose different programmatic missions accompanied by different admissions standards would be constitutionally suspect simply because one or more schools are racially identifiable. But here the differential admissions standards are remnants of the dual system with a continuing discriminatory effect, and the mission assignments "to some degree follow the historical racial assignments," 914 F. 2d, at 692. Moreover, the District Court did not justify the differing admissions standards based on the different mission assignments. It observed only that in the 1970's, the board of trustees justified a minimum ACT score of 15 because too many students with lower scores were not prepared for the historically white institutions and that imposing the 15 score requirement on admissions to the historically black institutions would decimate attendance at those universities. The District Court also stated that the mission of the regional universities had the more modest function of providing quality undergraduate education. Certainly the comprehensive universities are also, among other things, educating undergraduates. But we think the 15 ACT test score for automatic admission to the comprehensive universities, as compared with a score of 13 for the regionals, requires further justification in terms of sound educational policy.

Another constitutionally problematic aspect of the State's use of the ACT test scores is its policy of denying automatic admission if an applicant fails to earn the minimum ACT score specified for the particular institution, without also resorting to the applicant's high school grades as an additional factor in predicting college performance. The United States produced evidence that the American College Testing Program (ACTP), the administering organization of the ACT, discourages use of ACT scores as the sole admissions crite-

rion on the ground that it gives an incomplete "picture" of the student applicant's ability to perform adequately in college. App. 1209–1210. One ACTP report presented into evidence suggests that "it would be foolish" to substitute a 3- or 4-hour test in place of a student's high school grades as a means of predicting college performance. *Id.*, at 193. The record also indicated that the disparity between black and white students' high school grade averages was much narrower than the gap between their average ACT scores, thereby suggesting that an admissions formula which included grades would increase the number of black students eligible for automatic admission to all of Mississippi's public universities.[10]

The United States insists that the State's refusal to consider information which would better predict college performance than ACT scores alone is irrational in light of most States' use of high school grades and other indicators along with standardized test scores. The District Court observed that the board of trustees was concerned with grade inflation and the lack of comparability in grading practices and course offerings among the State's diverse high schools. Both the District Court and the Court of Appeals found this concern ample justification for the failure to consider high school grade performance along with ACT scores. In our view, such justification is inadequate because the ACT requirement was originally adopted for discriminatory purposes, the

---

[10] In 1985, 72 percent of white students in Mississippi scored 15 or better on the ACT test, whereas only 30 percent of black students achieved that mark, a difference of nearly 2½ times. By contrast, the disparity among grade averages was not nearly so wide. 43.8 percent of white high school students and 30.5 percent of black students averaged at least a 3.0, and 62.2 percent of whites and 49.2 percent of blacks earned at least a 2.5 grade point average. App. 1524–1525. Though it failed to make specific factfindings on this point, this evidence, which the State does not dispute, is fairly encompassed within the District Court's statement that "[b]lack students on the average score somewhat lower [than white students]." 674 F. Supp., at 1535.

current requirement is traceable to that decision and seemingly continues to have segregative effects, and the State has so far failed to show that the "ACT-only" admissions standard is not susceptible to elimination without eroding sound educational policy.

A second aspect of the present system that necessitates further inquiry is the widespread duplication of programs. "Unnecessary" duplication refers, under the District Court's definition, "to those instances where two or more institutions offer the same nonessential or noncore program.   Under this definition, all duplication at the bachelor's level of nonbasic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary."   674 F. Supp., at 1540.   The District Court found that 34.6 percent of the 29 undergraduate programs at historically black institutions are "unnecessarily duplicated" by the historically white universities, and that 90 percent of the graduate programs at the historically black institutions are unnecessarily duplicated at the historically white institutions. *Id.,* at 1541.   In its conclusions of law on this point, the District Court nevertheless determined that "there is no proof" that such duplication "is directly associated with the racial identifiability of institutions," and that "there is no proof that the elimination of unnecessary program duplication would be justifiable from an educational standpoint or that its elimination would have a substantial effect on student choice." *Id.,* at 1561.

The District Court's treatment of this issue is problematic from several different perspectives.  First, the court appeared to impose the burden of proof on the plaintiffs to meet a legal standard the court itself acknowledged was not yet formulated.   It can hardly be denied that such duplication was part and parcel of the prior dual system of higher education—the whole notion of "separate but equal" required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice.

*Brown* and its progeny, however, established that the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system. *Brown II*, 349 U. S., at 300. The court's holding that petitioners could not establish the constitutional defect of unnecessary duplication, therefore, improperly shifted the burden away from the State. Second, implicit in the District Court's finding of "unnecessary" duplication is the absence of any educational justification and the fact that some, if not all, duplication may be practicably eliminated. Indeed, the District Court observed that such duplication "cannot be justified economically or in terms of providing quality education." 674 F. Supp., at 1541. Yet by stating that "there is no proof" that elimination of unnecessary duplication would decrease institutional racial identifiability, affect student choice, and promote educationally sound policies, the court did not make clear whether it had directed the parties to develop evidence on these points, and if so, what that evidence revealed. See *id.*, at 1561. Finally, by treating this issue in isolation, the court failed to consider the combined effects of unnecessary program duplication with other policies, such as differential admissions standards, in evaluating whether the State had met its duty to dismantle its prior *de jure* segregated system.

We next address Mississippi's scheme of institutional mission classification, and whether it perpetuates the State's formerly *de jure* dual system. The District Court found that, throughout the period of *de jure* segregation, University of Mississippi, Mississippi State University, and University of Southern Mississippi were the flagship institutions in the state system. They received the most funds, initiated the most advanced and specialized programs, and developed the widest range of curricular functions. At their inception, each was restricted for the education solely of white persons. *Id.*, at 1526–1528. The missions of Mississippi University for Women and Delta State University, by contrast, were more

limited than their other all-white counterparts during the period of legalized segregation. Mississippi University for Women and Delta State University were each established to provide undergraduate education solely for white students in the liberal arts and such other fields as music, art, education, and home economics. *Id.*, at 1527–1528. When they were founded, the three exclusively black universities were more limited in their assigned academic missions than the five all-white institutions. Alcorn State, for example, was designated to serve as "an agricultural college for the education of Mississippi's black youth." *Id.*, at 1527. Jackson State and Mississippi Valley State were established to train black teachers. *Id.*, at 1528. Though the District Court's findings do not make this point explicit, it is reasonable to infer that state funding and curriculum decisions throughout the period of *de jure* segregation were based on the purposes for which these institutions were established.

In 1981, the State assigned certain missions to Mississippi's public universities as they then existed. It classified University of Mississippi, Mississippi State, and Southern Mississippi as "comprehensive" universities having the most varied programs and offering graduate degrees. Two of the historically white institutions, Delta State University and Mississippi University for Women, along with two of the historically black institutions, Alcorn State University and Mississippi Valley State University, were designated as "regional" universities with more limited programs and devoted primarily to undergraduate education. Jackson State University was classified as an "urban" university whose mission was defined by its urban location.

The institutional mission designations adopted in 1981 have as their antecedents the policies enacted to perpetuate racial separation during the *de jure* segregated regime. The Court of Appeals expressly disagreed with the District Court by recognizing that the "inequalities among the institutions largely follow the mission designations, and the mis-

sion designations to some degree follow the historical racial assignments." 914 F. 2d, at 692. It nevertheless upheld this facet of the system as constitutionally acceptable based on the existence of good-faith racially neutral policies and procedures. That different missions are assigned to the universities surely limits to some extent an entering student's choice as to which university to seek admittance. While the courts below both agreed that the classification and mission assignments were made without discriminatory purpose, the Court of Appeals found that the record "supports the plaintiffs' argument that the mission designations had the effect of maintaining the more limited program scope at the historically black universities." *Id.*, at 690. We do not suggest that absent discriminatory purpose the assignment of different missions to various institutions in a State's higher education system would raise an equal protection issue where one or more of the institutions become or remain predominantly black or white. But here the issue is whether the State has sufficiently dismantled its prior dual system; and when combined with the differential admission practices and unnecessary program duplication, it is likely that the mission designations interfere with student choice and tend to perpetuate the segregated system. On remand, the court should inquire whether it would be practicable and consistent with sound educational practices to eliminate any such discriminatory effects of the State's present policy of mission assignments.

Fourth, the State attempted to bring itself into compliance with the Constitution by continuing to maintain and operate all eight higher educational institutions. The existence of eight instead of some lesser number was undoubtedly occasioned by state laws forbidding the mingling of the races. And as the District Court recognized, continuing to maintain all eight universities in Mississippi is wasteful and irrational. The District Court pointed especially to the facts that Delta State and Mississippi Valley State are only 35 miles apart

and that only 20 miles separate Mississippi State and Mississippi University for Women. 674 F. Supp., at 1563–1564. It was evident to the District Court that "the defendants undertake to fund more institutions of higher learning than are justified by the amount of financial resources available to the state," *id.*, at 1564, but the court concluded that such fiscal irresponsibility was a policy choice of the legislature rather than a feature of a system subject to constitutional scrutiny.

Unquestionably, a larger rather than a smaller number of institutions from which to choose in itself makes for different choices, particularly when examined in the light of other factors present in the operation of the system, such as admissions, program duplication, and institutional mission designations. Though certainly closure of one or more institutions would decrease the discriminatory effects of the present system, see, *e. g., United States* v. *Louisiana,* 718 F. Supp. 499, 514 (ED La. 1989), based on the present record we are unable to say whether such action is constitutionally required.[11] Elimination of program duplication and revision of admissions criteria may make institutional closure unnecessary. However, on remand this issue should be carefully explored by inquiring and determining whether retention of all eight institutions itself affects student choice and perpetuates the segregated higher education system, whether maintenance of each of the universities is educationally justifiable, and whether one or more of them can be practicably closed or merged with other existing institutions.

Because the former *de jure* segregated system of public universities in Mississippi impeded the free choice of pro-

---

[11] It should be noted that in correspondence with the board of trustees in 1973, an HEW official expressed the "overall objective" of the Plan to be "that a student's choice of institution or campus, henceforth, will be based on other than racial criteria." App. 205. The letter added that closure of a formerly *de jure* black institution "would create a presumption that a greater burden is being placed upon the black students and faculty in Mississippi." *Id.*, at 206.

spective students, the State in dismantling that system must take the necessary steps to ensure that this choice now is truly free. The full range of policies and practices must be examined with this duty in mind. That an institution is predominantly white or black does not in itself make out a constitutional violation. But surely the State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies.

If we understand private petitioners to press us to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State *solely* so that they may be publicly financed, exclusively black enclaves by private choice, we reject that request. The State provides these facilities for *all* its citizens and it has not met its burden under *Brown* to take affirmative steps to dismantle its prior *de jure* system when it perpetuates a separate, but "more equal" one. Whether such an increase in funding is necessary to achieve a full dismantlement under the standards we have outlined, however, is a different question, and one that must be addressed on remand.

Because the District Court and the Court of Appeals failed to consider the State's duties in their proper light, the cases must be remanded. To the extent that the State has not met its affirmative obligation to dismantle its prior dual system, it shall be adjudged in violation of the Constitution and Title VI and remedial proceedings shall be conducted. The decision of the Court of Appeals is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I join the opinion of the Court, which requires public universities, like public elementary and secondary schools, to

affirmatively dismantle their prior *de jure* segregation in order to create an environment free of racial discrimination and to make aggrieved individuals whole. See *Brown* v. *Board of Education*, 349 U. S. 294, 299 (1955); *Milliken* v. *Bradley*, 418 U. S. 717, 746 (1974). I write separately to emphasize that it is Mississippi's burden to prove that it has undone its prior segregation, and that the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow. In light of the State's long history of discrimination, and the lost educational and career opportunities and stigmatic harms caused by discriminatory educational systems, see *Brown* v. *Board of Education*, 347 U. S. 483, 494 (1954); *Sweatt* v. *Painter*, 339 U. S. 629, 634–635 (1950); *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637, 640–641 (1950), the courts below must carefully examine Mississippi's proffered justifications for maintaining a remnant of *de jure* segregation to ensure that such rationales do not merely mask the perpetuation of discriminatory practices. Where the State can accomplish legitimate educational objectives through less segregative means, the courts may infer lack of good faith; "at the least it places a heavy burden upon the [State] to explain its preference for an apparently less effective method." *Green* v. *School Bd. of New Kent County*, 391 U. S. 430, 439 (1968). In my view, it also follows from the State's obligation to prove that it has "take[n] all steps" to eliminate policies and practices traceable to *de jure* segregation, *Freeman* v. *Pitts*, 503 U. S. 467, 485 (1992), that if the State shows that maintenance of certain remnants of its prior system is essential to accomplish its legitimate goals, then it still must prove that it has counteracted and minimized the segregative impact of such policies to the extent possible. Only by eliminating a remnant that unnecessarily continues to foster segregation or by negating insofar as possible its segregative impact can the State satisfy its

constitutional obligation to dismantle the discriminatory system that should, by now, be only a distant memory.

JUSTICE THOMAS, concurring.

"We must rally to the defense of our schools. We must repudiate this unbearable assumption of the right to kill institutions unless they conform to one narrow standard." Du Bois, Schools, 13 The Crisis 111, 112 (1917).

I agree with the Court that a State does not satisfy its obligation to dismantle a dual system of higher education merely by adopting race-neutral policies for the future administration of that system. Today, we hold that "[i]f policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." *Ante,* at 729. I agree that this statement defines the appropriate standard to apply in the higher education context. I write separately to emphasize that this standard is far different from the one adopted to govern the grade-school context in *Green* v. *School Bd. of New Kent County,* 391 U. S. 430 (1968), and its progeny. In particular, because it does not compel the elimination of all observed racial imbalance, it portends neither the destruction of historically black colleges nor the severing of those institutions from their distinctive histories and traditions.

In *Green,* we held that the adoption of a freedom-of-choice plan does not satisfy the obligations of a formerly *de jure* grade-school system should the plan fail to decrease, if not eliminate, the racial imbalance within that system. See *id.,* at 441. Although racial imbalance does not itself establish a violation of the Constitution, our decisions following *Green* indulged the presumption, often irrebuttable in practice, that a presently observed imbalance has been proximately caused by intentional state action during the prior *de jure* era. See, *e. g., Dayton Bd. of Ed.* v. *Brinkman,* 443 U. S. 526, 537 (1979); *Keyes* v. *School Dist. No. 1, Denver,* 413 U. S. 189,

211 (1973). As a result, we have repeatedly authorized the district courts to reassign students, despite the operation of facially neutral assignment policies, in order to eliminate or decrease observed racial imbalances. See, *e. g., Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 22–31 (1971); *Green, supra,* at 442, n. 6.

Whatever the merit of this approach in the grade-school context, it is quite plainly not the approach that we adopt today to govern the higher education context. We explicitly reject the use of remedies as "radical" as student reassignment—*i. e.,* "remedies akin to those upheld in *Green.*" *Ante,* at 730, n. 4; see also *ante,* at 728–729. Of necessity, then, we focus on the specific *policies* alleged to produce racial imbalance, rather than on the *imbalance* itself. Thus, a plaintiff cannot obtain relief merely by identifying a persistent racial imbalance, because the district court cannot provide a reassignment remedy designed to eliminate that imbalance directly. Plaintiffs are likely to be able to identify, as these plaintiffs have identified, specific policies traceable to the *de jure* era that continue to produce a current racial imbalance. As a practical matter, then, the district courts administering our standard will spend their time determining whether such policies have been adequately justified—a far narrower, more manageable task than that imposed under *Green.*

A challenged policy does not survive under the standard we announce today if it began during the prior *de jure* era, produces adverse impacts, and persists without sound educational justification. When each of these elements has been met, I believe, we are justified in not requiring proof of a present specific intent to discriminate. It is safe to assume that a policy adopted during the *de jure* era, if it produces segregative effects, reflects a discriminatory intent. As long as that intent remains, of course, such a policy cannot continue. And given an initially tainted policy, it is eminently reasonable to make the State bear the risk of nonpersuasion with respect to intent at some future time, both be-

cause the State has created the dispute through its own prior unlawful conduct, see, *e. g., Keyes, supra,* at 209–210, and because discriminatory intent does tend to persist through time, see, *e. g., Hazelwood School Dist.* v. *United States,* 433 U. S. 299, 309–310, n. 15 (1977). Although we do not formulate our standard in terms of a burden shift with respect to intent, the factors we do consider—the historical background of the policy, the degree of its adverse impact, and the plausibility of any justification asserted in its defense—are precisely those factors that go into determining intent under *Washington* v. *Davis,* 426 U. S. 229 (1976). See, *e. g., Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 266–267 (1977). Thus, if a policy remains in force, without adequate justification and despite tainted roots and segregative effect, it appears clear—clear enough to presume conclusively—that the State has failed to disprove discriminatory intent.

We have no occasion to elaborate upon what constitutes an adequate justification. Under *Green,* we have recognized that an otherwise unconstitutional policy may be justified if it serves "important and legitimate ends," *Dayton, supra,* at 538, or if its elimination is not "practicable," *Board of Ed. of Oklahoma City Public Schools* v. *Dowell,* 498 U. S. 237, 250 (1991). As JUSTICE SCALIA points out, see *post,* at 753–754, our standard appears to mirror these formulations rather closely. Nonetheless, I find most encouraging the Court's emphasis on "sound *educational* practices," *ante,* at 729 (emphasis added); see also, *e. g., ante,* at 731 ("sound educational justification"); *ante,* at 736 ("sound educational policy"). From the beginning, we have recognized that desegregation remedies cannot be designed to ensure the elimination of any remnant at any price, but rather must display "a practical flexibility" and "a facility for adjusting and reconciling public and private needs." *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955). Quite obviously, one compelling need to be considered is the *educational* need of the present and

future *students* in the Mississippi university system, for whose benefit the remedies will be crafted.

In particular, we do not foreclose the possibility that there exists "sound educational justification" for maintaining historically black colleges *as such*. Despite the shameful history of state-enforced segregation, these institutions have survived and flourished. Indeed, they have expanded as opportunities for blacks to enter historically white institutions have expanded. Between 1954 and 1980, for example, enrollment at historically black colleges increased from 70,000 to 200,000 students, while degrees awarded increased from 13,000 to 32,000. See S. Hill, National Center for Education Statistics, The Traditionally Black Institutions of Higher Education 1860 to 1982, pp. xiv–xv (1985). These accomplishments have not gone unnoticed:

> "The colleges founded for Negroes are both a source of pride to blacks who have attended them and a source of hope to black families who want the benefits of higher learning for their children. They have exercised leadership in developing educational opportunities for young blacks at all levels of instruction, and, especially in the South, they are still regarded as key institutions for enhancing the general quality of the lives of black Americans." Carnegie Commission on Higher Education, From Isolation to Mainstream: Problems of the Colleges Founded for Negroes 11 (1971).

I think it undisputable that these institutions have succeeded in part because of their distinctive histories and traditions; for many, historically black colleges have become "a symbol of the highest attainments of black culture." J. Preer, Lawyers v. Educators: Black Colleges and Desegregation in Public Higher Education 2 (1982). Obviously, a State cannot maintain such traditions by closing particular institutions, historically white or historically black, to particular racial groups. Nonetheless, it hardly follows that a

State cannot operate a diverse assortment of institutions—including historically black institutions—open to all on a race-neutral basis, but with established traditions and programs that might disproportionately appeal to one race or another. No one, I imagine, would argue that such institutional *diversity* is without "sound educational justification," or that it is even remotely akin to program *duplication*, which is designed to separate the races for the sake of separating the races. The Court at least hints at the importance of this value when it distinguishes *Green* in part on the ground that colleges and universities "are not fungible." *Ante*, at 729. Although I agree that a State is not constitutionally *required* to maintain its historically black institutions as such, see *ante*, at 743, I do not understand our opinion to hold that a State is *forbidden* to do so. It would be ironic, to say the least, if the institutions that sustained blacks during segregation were themselves destroyed in an effort to combat its vestiges.

JUSTICE SCALIA, concurring in the judgment in part and dissenting in part.

With some of what the Court says today, I agree. I agree, of course, that the Constitution compels Mississippi to remove all discriminatory barriers to its state-funded universities. *Brown* v. *Board of Education*, 347 U. S. 483 (1954) (*Brown I*). I agree that the Constitution does not compel Mississippi to remedy funding disparities between its historically black institutions (HBI's) and historically white institutions (HWI's). And I agree that Mississippi's American College Testing Program (ACT) requirements need further review. I reject, however, the effectively unsustainable burden the Court imposes on Mississippi, and all States that formerly operated segregated universities, to demonstrate compliance with *Brown I*. That requirement, which resembles what we prescribed for primary and secondary schools in *Green* v. *School Bd. of New Kent County*, 391 U. S. 430

(1968), has no proper application in the context of higher education, provides no genuine guidance to States and lower courts, and is as likely to subvert as to promote the interests of those citizens on whose behalf the present suit was brought.

## I

Before evaluating the Court's handiwork, it is no small task simply to comprehend it. The Court sets forth not one, but seemingly two different tests for ascertaining compliance with *Brown I*—though in the last analysis they come to the same. The Court initially announces the following test, in Part III of its opinion: All policies (i) "traceable to [the State's] prior *[de jure]* system" (ii) "that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—" must be eliminated (iii) to the extent "practicabl[e]" and (iv) consistent with "sound educational" practices. *Ante*, at 731. When the Court comes to applying its test, however, in Part IV of the opinion, "influencing student enrollment decisions" is not merely one example of a "segregative effec[t]," but is elevated to an independent and essential requirement of its own. The policies that must be eliminated are those that (i) are legacies of the dual system, (ii) "contribute to the racial identifiability" of the State's universities (the same as (i) and (ii) in Part III), and, in addition, (iii) do so in a way that *"substantially restrict[s] a person's choice of which institution to enter."* *Ante*, at 733 (emphasis added). See also *ante*, at 734–735, 738–739, 741–743.

What the Court means by "substantially restrict[ing] a person's choice of which institution to enter" is not clear. During the course of the discussion in Part IV the requirement changes from one of strong coercion ("substantially restrict," *ante*, at 733, "interfere," *ante*, at 741), to one of middling pressure ("restrict," *ante*, at 734, "limi[t]," *ante*, at 741), to one of slight inducement ("inherent[ly] self-selec[t]," *ante*, at 735, n. 9, "affect," *ante*, at 739, 742). If words have any

meaning, in this last stage of decrepitude the requirement is so frail that almost anything will overcome it. Even an open-admissions policy would fall short of ensuring that student choice is un*affected* by state action. The Court's results also suggest that the "restricting choice" requirement is toothless. Nothing else would explain how it could be met by Mississippi's mission designations, program duplication, and operation of all eight formerly *de jure* colleges. Only a test aimed at state action that "affects" student choice could implicate policies such as these, which in no way *restrict* the decision where to attend college. (Indeed, program duplication and continuation of the eight schools have quite the opposite effect; they *multiply*, rather than restrict, limit, or impede the available choices.) At the end of the day, then, the Court dilutes this potentially useful concept to the point of such insignificance that it adds nothing to the Court's test except confusion. It will be a fertile source of litigation.

Almost as inscrutable in its operation as the "restricting choice" requirement is the requirement that challenged state practices perpetuate *de facto* segregation. That is "likely" met, the Court says, by Mississippi's mission designations. *Ante*, at 741. Yet surely it is apparent that by designating three colleges of the same prior disposition (HWI's) as the *only* comprehensive schools, Mississippi encouraged integration; and that the suggested alternative of elevating an HBI to comprehensive status (so that blacks could go there instead of to the HWI's) would have been an invitation to continuing segregation. See *Ayers* v. *Allain*, 674 F. Supp. 1523, 1562 (ND Miss. 1987) ("Approximately 30% of all black college students attending four-year colleges in the state attend one of the comprehensive universities"). It appears, moreover, that even if a particular practice does not, in isolation, rise to the minimal level of fostering segregation, it can be aggregated with other ones, and the *composite* condemned. See *ante*, at 739–740 ("by treating [the] issue [of program duplication] in isolation, the [district] court failed to consider the combined effects of unnecessary program duplication

with other policies, such as differential admissions standards"); *ante*, at 741 ("[W]hen combined with the differential admission practices and unnecessary program duplication, it is likely that the mission designations ... tend to perpetuate the segregated system"). It is interesting to speculate how university administrators are going to guess which practices a district judge will choose to aggregate; or how district judges are going to guess when disaggregation is lawful.

The Court appears to suggest that a practice that has been aggregated and condemned may be disaggregated and approved so long as it does not *itself* "perpetuat[e] the segregated higher education system," *ante*, at 742—which seems, of course, to negate the whole purpose of aggregating in the first place. The Court says:

> "Elimination of program duplication and revision of admissions criteria may make institutional closure unnecessary. ... [O]n remand this issue should be carefully explored by inquiring and determining whether retention of all eight institutions itself ... perpetuates the segregated higher education system, whether maintenance of each of the universities is educationally justifiable, and whether one or more of them can be practicably closed or merged with other existing institutions." *Ibid.*

Perhaps the Court means, however, that even if retention of all eight institutions is found by itself *not* to "perpetuat[e] the segregated higher education system," it must *still* be found that such retention is "educationally justifiable," or that none of the institutions can be "practicably closed or merged." It is unclear.

Besides the ambiguities inherent in the "restricting choice" requirement and the requirement that the challenged state practice or practices perpetuate segregation, I am not sanguine that there will be comprehensible content to the to-be-defined-later (and, make no mistake about it, outcome-

determinative) notions of "sound educational justification" and "impracticable elimination." In short, except for the results that it produces in the present litigation (which are what they are because the Court says so), I have not the slightest idea how to apply the Court's analysis—and I doubt whether anyone else will.

Whether one consults the Court's description of what it purports to be doing, in Part III, *ante*, at 727–732, or what the Court actually does, in Part IV, *ante*, at 732–743, one must conclude that the Court is essentially applying to universities the amorphous standard adopted for primary and secondary schools in *Green* v. *School Bd. of New Kent County*, 391 U. S. 430 (1968). Like that case, today's decision places upon the State the ordinarily unsustainable burden of proving the negative proposition that *it* is not responsible for extant racial disparity in enrollment. See *ante*, at 728. *Green* requires school boards to prove that racially identifiable schools are *not* the consequence of past or present discriminatory state action, *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1, 26 (1971); today's opinion requires state university administrators to prove that racially identifiable schools are *not* the consequence of any practice or practices (in such impromptu "aggregation" as might strike the fancy of a district judge) held over from the prior *de jure* regime. This will imperil virtually any practice or program plaintiffs decide to challenge—just as *Green* has—so long as racial imbalance remains. And just as under *Green*, so also under today's decision, the only practicable way of disproving that "existing racial identifiability is attributable to the State," *ante*, at 728, *is to eliminate extant segregation, i. e., to assure racial proportionality in the schools.* Failing that, the State's only defense will be to establish an excuse for each challenged practice—either impracticability of elimination, which is also a theoretical excuse under the *Green* regime, see *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 249–250 (1991),

or sound educational value, which (presumably) is not much different from the "important and legitimate ends" excuse available under *Green,* see *Dayton Bd. of Ed.* v. *Brinkman,* 443 U. S. 526, 538 (1979).

## II

Application of the standard (or standards) announced today has no justification in precedent, and in fact runs contrary to a case decided six years ago, see *Bazemore* v. *Friday,* 478 U. S. 385 (1986). The Court relies primarily upon citations of *Green* and other primary and secondary school cases. But those decisions left open the question whether *Green* merits application in the distinct context of higher education. Beyond that, the Court relies on *Brown I, Florida ex rel. Hawkins* v. *Board of Control of Fla.,* 350 U. S. 413 (1956) *(per curiam),* and *Gilmore* v. *City of Montgomery,* 417 U. S. 556 (1974). That reliance also is mistaken.

The constitutional evil of the "separate but equal" regime that we confronted in *Brown I* was that blacks were told to go to one set of schools, whites to another. See *Plessy* v. *Ferguson,* 163 U. S. 537 (1896). What made this "evenhanded" racial partitioning offensive to equal protection was its implicit stigmatization of minority students: "To separate [black students] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown I,* 347 U. S., at 494. In the context of higher education, a context in which students decide whether to attend school and if so where, the only unconstitutional derivations of that bygone system are those that limit access on discriminatory bases; for only they have the potential to generate the harm *Brown I* condemned, and only they have the potential to deny students equal access to the best public education a State has to offer. Legacies of the dual system that permit (or even incidentally facilitate) free choice of racially

identifiable schools—while still assuring each individual student the right to attend *whatever* school he wishes—do not have these consequences.

Our decisions immediately following *Brown I* also fail to sustain the Court's approach. They, too, suggest that former *de jure* States have one duty: to eliminate discriminatory obstacles to admission. *Brown* v. *Board of Education*, 349 U. S. 294 (1955) *(Brown II)*, requires States "to achieve a system of determining admission to the public schools on a nonracial basis," *id.*, at 300–301, as do other cases of that era, see, *e. g., Cooper* v. *Aaron*, 358 U. S. 1, 7 (1958); *Goss* v. *Board of Ed. of Knoxville*, 373 U. S. 683, 687 (1963).

Nor do *Hawkins* or *Gilmore* support what the Court has done. *Hawkins* involved a segregated graduate school, to be sure. But our one-paragraph *per curiam* opinion supports nothing more than what I have said: The duty to dismantle means the duty to establish nondiscriminatory admissions criteria. See 350 U. S., at 414 ("He is entitled to prompt admission under the rules and regulations applicable to other qualified candidates"). Establishment of neutral admissions standards, not the eradication of all "policies traceable to the *de jure* system . . . hav[ing] discriminatory effects," *ante*, at 729, is what *Hawkins* is about. Finally, *Gilmore*, quite simply, is inapposite. All that we did there was uphold an order enjoining a city from granting exclusive access to its parks and recreational facilities to segregated private schools and to groups affiliated with such schools. 417 U. S., at 569. Notably, in the one case that does bear proximately on today's decision, *Bazemore, supra,* we declined to apply *Gilmore*. See *Bazemore, supra,* at 408 (WHITE, J., concurring) ("Our cases requiring parks and the like to be desegregated lend no support for requiring more than what has been done in this case").

If we are looking to precedent to guide us in the context of higher education, we need not go back 38 years to *Brown I*, read between the lines of *Hawkins*, or conjure authority

*(Gilmore)* that does not exist. In *Bazemore* v. *Friday,* *supra,* we addressed a dispute parallel in all relevant respects to this one. At issue there was state financing of 4–H and Homemaker youth clubs by the North Carolina Agricultural Extension Service, a division of North Carolina State University. In the *Plessy* era, club affiliations had been dictated by race; after 1964, they were governed by neutral criteria. Yet "there were a great many all-white and all-black clubs" at the time suit was filed. 478 U. S., at 407. We nonetheless declined to adopt *Green's* requirement that "affirmative action [be taken] to integrate" once segregated-by-law/still segregated-in-fact state institutions. 478 U. S., at 408. We confined *Green* to primary and secondary public schools, where "schoolchildren must go to school" and where "school boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend." 478 U. S, at 408. "[T]his case," we said, "presents no current violation of the Fourteenth Amendment since the Service has discontinued its prior discriminatory practices and has adopted a wholly neutral admissions policy. The mere continued existence of single-race clubs does not make out a constitutional violation." *Ibid.*

The Court asserts that we reached the result we did in *Bazemore* "only after satisfying ourselves that the State had not fostered segregation by playing a part in the decision of which club an individual chose to join," *ante,* at 731—implying that we assured ourselves there, as the Court insists we must do here, that none of the State's practices carried over from *de jure* days incidentally played a part in the decision of which club an individual chose to join. We did no such thing. An accurate description of *Bazemore* was set forth in *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469 (1989): "mere existence of single-race clubs . . . cannot create a duty to integrate," we said *Bazemore* held, "in absence of *evidence of exclusion by race,*" 488 U. S., at 503 (emphasis added)—

*not* "in absence of evidence of state action playing a part in the decision of which club an individual chose to join." The only thing we "satisfied ourselves" about in *Bazemore* was that the club members' choices were "wholly voluntary and unfettered," 478 U. S., at 407—which does not mean the State "play[ed] [no] part in the decision of which club an individual chose to join," however much the Court may mush the concepts together today. It is, on the face of things, entirely unbelievable that the previously established characteristics of the various all-white and all-black 4–H Clubs (where each of them met, for example) did not even play a part in young people's decisions of which club to join.

*Bazemore*'s standard for dismantling a dual system ought to control here: discontinuation of discriminatory practices and adoption of a neutral admissions policy. To use *Green* nomenclature, modern racial imbalance remains a "vestige" of past segregative practices in Mississippi's universities, in that the previously mandated racial identification continues to affect where students choose to enroll—just as it surely affected which clubs students chose to join in *Bazemore.* We tolerated this vestigial effect in *Bazemore*, squarely rejecting the view that the State was obliged to correct "the racial segregation resulting from [its prior] practice[s]." 478 U. S., at 417 (Brennan, J., dissenting in part). And we declined to require the State, as the Court has today, to prove that no holdover practices of the *de jure* system, *e. g.*, program offerings in the different clubs, played a role in the students' decisions of which clubs to join. If that analysis was correct six years ago in *Bazemore*, and I think it was, it must govern here as well. Like the club attendance in *Bazemore* (and unlike the school attendance in *Green*), attending college is voluntary, not a legal obligation, and which institution particular students attend is determined by their own choice, not by "school boards [who] customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend." *Baze-*

*more, supra,* at 408. Indeed, *Bazemore* was a more appealing case than these for adhering to the *Green* approach, since the 4–H Clubs served students similar in age to those in *Green,* and had been "organized in the public schools" until the early 1960's. 478 U. S., at 417.

It is my view that the requirement of compelled integration (whether by student assignment, as in *Green* itself, or by elimination of nonintegrated options, as the Court today effectively decrees) does not apply to higher education. Only one aspect of a historically segregated university system need be eliminated: discriminatory admissions standards. The burden is upon the formerly *de jure* system to show that that has been achieved. Once that has been done, however, it is not just unprecedented, but illogical as well, to establish that former *de jure* States continue to deny equal protection of the law to students whose choices among public university offerings are unimpeded by discriminatory barriers. Unless one takes the position that *Brown I* required States not only to provide equal access to their universities but also to correct lingering disparities between them, that is, to remedy institutional noncompliance with the "equal" requirement of *Plessy,* a State is in compliance with *Brown I* once it establishes that it has dismantled all discriminatory barriers to its public universities. Having done that, a State is free to govern its public institutions of higher learning as it will, unless it is convicted of discriminating anew—which requires both discriminatory intent and discriminatory causation. See *Washington* v. *Davis,* 426 U. S. 229 (1976).

That analysis brings me to agree with the judgment that the Court of Appeals must be reversed in part—for the reason (quite different from the Court's) that Mississippi has not borne the burden of demonstrating that intentionally discriminatory admissions standards have been eliminated. It has been established that Mississippi originally adopted ACT assessments as an admissions criterion because that was an effective means of excluding blacks from the HWI's. See

*Ayers* v. *Allain,* 674 F. Supp., at 1555; *Ayers* v. *Allain,* 914 F. 2d 676, 690 (CA5 1990) (en banc). Given that finding, the District Court should have required Mississippi to prove that its continued use of ACT requirements does not have a racially exclusionary purpose and effect—a not insubstantial task, see *Freeman* v. *Pitts,* 503 U. S. 467, 503 (SCALIA, J., concurring).

## III

I must add a few words about the unanticipated consequences of today's decision. Among petitioners' contentions is the claim that the Constitution requires Mississippi to correct funding disparities between its HBI's and HWI's. The Court rejects that, see *ante,* at 743—as I think it should, since it is students and not colleges that are guaranteed equal protection of the laws. See *Sweatt* v. *Painter,* 339 U. S. 629, 635 (1950); *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337, 351 (1938). But to say that the Constitution does not *require* equal funding is not to say that the Constitution *prohibits* it. The citizens of a State may conclude that if certain of their public educational institutions are used predominantly by whites and others predominantly by blacks, it is desirable to fund those institutions more or less equally.

Ironically enough, however, today's decision seems to prevent adoption of such a conscious policy. What the Court says about duplicate programs is as true of equal funding: The requirement "was part and parcel of the prior dual system." *Ante,* at 738. Moreover, equal funding, like program duplication, facilitates continued segregation—enabling students to attend schools where their own race predominates without paying a penalty in the quality of education. Nor could such an equal-funding policy be saved on the basis that it serves what the Court calls a "sound educational justification." The only conceivable *educational* value it furthers is that of fostering schools in which blacks receive their education in a "majority" setting; but to acknowledge that as a "value" would contradict the compulsory-integration philoso-

phy that underlies *Green*. Just as vulnerable, of course, would be all other programs that have the effect of facilitating the continued existence of predominantly black institutions: elevating an HBI to comprehensive status (but see *ante,* at 740–741, where the Court inexplicably suggests that this action may be required); offering a so-called Afrocentric curriculum, as has been done recently on an experimental basis in some secondary and primary schools, see Jarvis, *Brown* and the Afrocentric Curriculum, 101 Yale L. J. 1285, 1287, and n. 12 (1992); preserving eight separate universities, see *ante,* at 741–742, which is perhaps Mississippi's single policy most segregative in effect; or providing funding for HBI's as HBI's, see 20 U. S. C. §§ 1060–1063c, which does just that.

But this predictable impairment of HBI's should come as no surprise: for incidentally facilitating—indeed, even tolerating—the continued existence of HBI's is not what the Court's test is about, and has never been what *Green* is about. See *Green,* 391 U. S., at 442 ("The Board must be required to formulate a new plan and . . . fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school") (footnote omitted). What the Court's test is designed to achieve is the elimination of predominantly black institutions. While that may be good social policy, the present petitioners, I suspect, would not agree; and there is much to be said for the Court of Appeals' perception in *Ayers,* 914 F. 2d, at 687, that "if no [state] authority exists to deny [the student] the right to attend the institution of his choice, he is done a severe disservice by remedies which, in seeking to maximize integration, minimize diversity and vitiate his choices." But whether or not the Court's antagonism to unintegrated schooling is good policy, it is assuredly not good constitutional law. There is nothing unconstitutional about a "black" school in the sense, not of a school that blacks *must* attend and that whites *cannot,* but of a school that, as a consequence of private choice

in residence or in school selection, contains, and has long contained, a large black majority. See *McLaurin* v. *Oklahoma State Regents for Higher Ed.,* 339 U. S. 637, 641 (1950). (The Court says this, see *ante,* at 743, but does not appear to mean it, see *ante,* at 730, n. 4.) In a perverse way, in fact, the insistence, whether explicit or implicit, that such institutions not be permitted to endure perpetuates the very stigma of black inferiority that *Brown I* sought to destroy. Not only Mississippi, but Congress itself, seems out of step with the drum that the Court beats today, judging by its passage of an Act entitled "Strengthening Historically Black Colleges and Universities," which authorizes the Education Department to provide money grants to historically black colleges. 20 U. S. C. §§ 1060–1063c. The implementing regulations designate Alcorn State University, Jackson State University, and Mississippi Valley State University as eligible recipients. See 34 CFR § 608.2(b) (1991).

\* \* \*

The Court was asked to decide today whether, in the provision of university education, a State satisfies its duty under *Brown I* by removing discriminatory barriers to admissions. That question required us to choose between the standards established in *Green* and *Bazemore,* both of which involved (as, for the most part, this does) free-choice plans that failed to end *de facto* segregation. Once the confusion engendered by the Court's something-for-all, guidance-to-none opinion has been dissipated, compare *ante,* at 744–745 (O'CONNOR, J., concurring), with *ante,* at 747–749 (THOMAS, J., concurring), it will become apparent that, essentially, the Court has adopted *Green.*

I would not predict, however, that today's opinion will succeed in producing the same result as *Green*—viz., compelling the States to compel racial "balance" in their schools—because of several practical imperfections: because the Court deprives district judges of the most efficient (and perhaps

the only effective) *Green* remedy, mandatory student assignment, see *ante*, at 730, n. 4; because some contradictory elements of the opinion (its suggestion, for example, that Mississippi's mission designations foster, rather than deter, segregation) will prevent clarity of application; and because the virtually standardless discretion conferred upon district judges (see Part I, *supra*) will permit them to do pretty much what they please. What I do predict is a number of years of litigation-driven confusion and destabilization in the university systems of all the formerly *de jure* States, that will benefit neither blacks nor whites, neither predominantly black institutions nor predominantly white ones. Nothing good will come of this judicially ordained turmoil, except the public recognition that any court that would knowingly impose it must hate segregation. We must find some other way of making that point.