Jake AYERS, Jr.; Bennie G. Thompson; Virginia Hill; B. Leon Johnson; Pamela Gipson, Individually and on Behalf of All Others Similarly Situated; et al., Plaintiffs.

United States of America, Plaintiff/Intervenor,

v.

Kirk FORDICE, Governor, State of Mississippi, et al., Defendants.

No. 4:75CV009–B–0.

United States District Court, N.D. Mississippi, Greenville Division.

March 24, 1999.

Armand Derfner, Armand Derfner, Attorney, Charleston, SC, Robert Pressman, Robert Pressman, Attorney, Lexington, MA, Alvin O. Chambliss, Jr., Alvin O. Chambliss, Attorney, Texas Southern University, Thurgood Marshall School of Law, Houston, TX, for Jake Ayers, Jr., Private Plaintiffs, plaintiffs.

John R. Hailman, U.S. Attorney's Office, Oxford, MS, Nathaniel Douglas, K. Heshima White, U.S. Department of Justice—Civil Rights Division, Educational Opportunities Section, Washington, DC, for Plaintiff/Intervenors (Government), intervenor–plaintiff.

Michael C. Moore, Mississippi Attorney General's Office, Jackson, MS, William F. Goodman, Jr. Paul H. Stephenson, III, Watkins & Eager, Jackson, MS, for Gover-

nor Kirk Fordice, Defendants/Senior Colleges, defendants.

## *ORDER*

BIGGERS, Chief Judge.

The private plaintiffs in the above styled and numbered cause and the United States have moved for an injunction to prohibit the defendant Board of Trustees of State Institutions of Higher Learning (the Board) from expanding the academic program offerings at the University of Southern Mississippi–Gulf Coast (USMGC) to include lower division courses which would, in effect, make the Gulf Coast campus a four-year institution. The Board has moved for authorization to expand the academic programs at USMGC by adding the lower division or first two-year courses to its curricula. Having held an evidentiary hearing on March 17, 1999, the court is ready to rule.

The private plaintiffs and the United States basically cite two reasons in support of their motion for enjoinder of the Board's proposed actions on the Gulf Coast as follows: (1) The State should not embark on the building of an additional four-year campus with the additional financial expenditures that it would entail until all the financial obligations of implementing the desegregation decree at the existing universities are completed; and (2) the proposal of the Board modifies the admissions standards that have previously been ordered to apply to all universities under the Board's jurisdiction.

## THE FUNDING ISSUE

■ The Board came to the court in 1994, arguing that the present number of eight four-year campuses in this state should be reduced to six in the name of educational and financial efficiency and to promote desegregation. Now, paradoxically, the Board comes to the court suggesting that it is educationally and financially efficient and sound to have not six, but nine four-year campuses. The court did not disagree with the Board's position in 1994 that educational and financial efficiency would improve if the number of four-year campuses were reduced from eight to six. The court merely stated in its findings that the reduction to six four-year campuses was not constitutionally mandated[1] and the court would not expand the Constitution to encroach on the State's power to regulate its system of higher education, except in those areas which clearly violated individual constitutional rights. The court advised the Board that if it wished to reduce the number of four-year campuses to six, that would be a matter it could pursue outside this case.

In a similar vein, the court is now considering the State's new position that it is educationally and financially sound to have nine four-year campuses and whether that is an issue which rises to the level of a constitutional question or one which should be left within the purview of the state governing bodies, regardless of its educational and financial soundness or lack thereof.

In the Remedial Decree entered in this case, the court ordered, *inter alia,* specific programs to be implemented at the historically black institutions (HBIs) for the purpose of desegregating those institutions. Of course, the implementation of new programs involves new and additional expenditures.

## THE PURPOSE OF THE NEW PROGRAMS AND ENHANCEMENTS AT THE HISTORICALLY BLACK INSTITUTIONS

From the arguments that have been presented to the court over the years in

---

1. The Supreme Court, noting this court's conclusion after the 1987 trial that "fiscal irresponsibility was a policy choice of the legislature rather than a feature of a system subject to constitutional scrutiny," stated "based on the present record we are unable to say whether [closure of one or more institutions] is constitutionally required." *United States v. Fordice,* 505 U.S. 717, 742, 112 S.Ct. 2727, 120 L.Ed.2d 575, 601 (1992).

this case and since the Remedial Decree, it appears to the court that the rationale for the enhancements at the historically black institutions is misunderstood. The real purpose of the enhancements ordered by the court is to desegregate the HBIs, i.e., to attract more white students to attend them. The purpose of the enhancements is not to build up a college so that the African–American citizens of the state will have bigger and better segregated black colleges which they may attend. Such a desegregation approach would in effect strengthen segregation, as has been seen in other states.

All citizens of this state have an equal opportunity to attend any of the eight state-operated universities, since the admissions requirements for all eight universities are now identical. No longer are the African–American students, who have historically made lower grades on the standardized entrance tests, channelled away from the white universities and toward the black institutions, which historically have had lower entrance requirements. Under the Remedial Decree in this case, if a student is qualified to attend Mississippi Valley State University, he or she is qualified to attend Mississippi State University (MSU) or any of the other state universities. If a particular student thinks he or she can get a better education in a particular field of study at the University of Southern Mississippi or the University of Mississippi, that student is qualified to attend those larger comprehensive universities if the student is qualified to attend any of the historically black institutions. No longer, therefore, is there any admissions policy in effect which would exclude African–American students from any of the eight universities or, conversely, tend to channel white students to the historically white universities and black students to the historically black universities.

It would be a violation of the Constitution to build up a historically black institution by the addition of new programs and facilities just so African–American students would have a better school to attend, just as it would be a violation of the Constitution to build up a historically white institution just so that white students would have a better university to attend than the African–American citizens have. As Justice Byron White said in the opinion of the Supreme Court which considered this case:

> If we understand private petitioners to press us to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State *solely* so that they may be publicly financed, exclusively black enclaves by private choice, we reject that request.

*United States v. Fordice*, 505 U.S. 717, 743, 112 S.Ct. 2727, 120 L.Ed.2d 575, 602 (1992) (emphasis in original). The court-ordered enhancements at the historically black institutions are basically for the purpose of improving the colleges in such a way as to attract more white citizens of this state to attend them, as well as to allow African–American citizens of this state to take advantage of these more desirable institutions. It is not the institutions per se that the court is attempting to help. It is the citizens of the state, both black and white, who have standing in this court to be protected by the Constitution, not the universities. As previously stated, the colleges and universities themselves have no constitutional right to be enhanced. *Ayers v. Fordice*, 879 F.Supp. 1419, 1429–30 (N.D.Miss.1995).

## THE FUNDING OF AYERS REMEDIES

Since the Remedial Decree of this court was entered in 1995, the court has not ordered specific amounts of funding for specific years and for specific universities for the purpose of implementing specific parts of the Remedial Decree. Rather, the implementation of the Remedial Decree has been left mostly up to the Board as to the selection of programs which would effectively desegregate the institutions, and the Board has set its own pace

of implementation as influenced by the cooperation of the Mississippi Legislature. The court left these decisions primarily to the Board while the plaintiffs appealed to the Fifth Circuit Court of Appeals and the United States Supreme Court the Remedial Decree as ordered by this court. The court was not of a mind to order that specific parts of the decree be put into effect until the appellate courts had examined the Remedial Decree and affirmed it. Now that the Remedial Decree has basically been affirmed, the court is now inclined to become more active in carrying out the desegregation decree.

In the enhancements of the historically black institutions as implemented by the Board and the legislature since the 1995 decree was entered, the Board has taken upon itself, without specific orders from the court, to place several new programs and facilities at the HBIs. The Board has advised the court that it estimates over $40,000,000.00 has been expended on carrying out parts of the Remedial Decree. Some of the enhancements made thus far, on the Board's initiative and in response to the Remedial Decree, are as follows: new programs in business, social work, urban planning and health care administration at Jackson State University, a new MBA program at Alcorn State University's Natchez Center and new history and special education programs at Mississippi Valley State University. The court has observed that the legislature has been generally responsive to the proposals by the Board for the financing and implementation of new projects at the universities. While not every dollar requested by the Board has been appropriated, the court notes that all of the actions taken thus far have been without any court order directing the State to carry out any specific implementation at any specific time. The court, therefore, does assume that future programs and facilities which may be specifically ordered by the court will also be at least as responsively received and acted upon as have the Board's proposals to the legislature.

As has been previously stated, but probably cannot be overstated, the purpose of the enhancements at the universities is for the purpose of desegregating them and not merely to have universities with more programs. The court has been advised by the Board that even though in excess of $40,000,000.00 has been expended by the Board in enhancements and studies for enhancements of the historically black universities, desegregation of those universities has not been significantly affected. It should be noted that the universities also have an obligation to play a strong role in desegregating themselves by recruitment and making the universities attractive, educationally and socially, to other-race students. Records examined during the 1994 trial revealed that some of the HBIs had not aggressively recruited other-race students at predominantly white high schools or attempted to make other-race students welcome at these institutions. Money alone will not attract other-race students to a university. The faculty and students of a university must also make the other-race students feel comfortable when they are in a minority. The historically white institutions have evidenced much more work and programs for the recruitment of other-race students than have the HBIs. The success of desegregating the colleges will continue to be monitored and if any new program which the expert witnesses testified would attract other-race students does not do so, the new program may need to be changed or cancelled. Of course, the results of three years is too short a time to make a good judgment on this issue.

## EDUCATIONAL SOUNDNESS OF ADDING A FOUR-YEAR CAMPUS

The Board projects that within five years the entering freshman class at the USMGC campus will be larger than the entering freshman classes at Mississippi Valley State University, Alcorn State University and Mississippi University for Women. Notwithstanding the considera-

ble expenditures in supporting this proposed new campus, there has been no professional study, proposed or conducted, recommending the addition of this campus to the Mississippi university system.

At the hearing before the court on this issue, the Board's witness, Dr. James Williams, Vice–President of USMGC, when questioned about where the idea for this four-year campus originated, replied that it came from the people in the community. The following colloquy took place:

THE COURT: Dr. Williams, where did this idea of establishing a four-year program on the Gulf Coast come from, and what rationale supports it? Who started this idea?

THE WITNESS: The idea really comes from the community, and they point out the disparity in the proportion of the adult population who have four-year degrees as they compare it to places like Jackson and Hattiesburg. They also use figures that show at the point of high school graduation—

THE COURT: You say "the community," and who is this? A motel owner or Presbyterian preacher or who?

THE WITNESS: People from the business community; people from the professional community; people who head media; mayors; board of alderman members; councilmen; legislators.

THE COURT: Well, are they aware of the program that you've got with the Gulf Coast Community College whereby they can go two years at the Gulf Coast and then go two years to Southern to get a four-year degree if they want to get a degree?

THE WITNESS: Yes, sir, they are aware of that. We have over the years done a substantial—made a substantial effort in terms of getting that word out that it is available, yes, sir.

(March 17, 1999 Hearing Transcript).

The normal course of action for the Board in adding programs at existing university campuses is to do a study, often contracted to outside professional consultants, to determine whether the proposed course or program is justified; yet, there has been no such study to determine if a proposed four-year campus should be added to the state system.

There exists at this time an excellent community college system on the Gulf Coast, offering freshman and sophomore courses from which graduating students may directly enter the upper level courses at the existing USM campus on the Coast and graduate from USM without ever leaving the Gulf Coast area. This is the same type system that is in existence in other parts of the state. In Tupelo, there is an Itawamba Community College (ICC) and University of Mississippi (UM) joint campus which provides access to the same type of "place bound" students that USM is proposing will be benefitted by its new campus on the Gulf Coast. The students can enter ICC the first two years and then progress to the University of Mississippi program for the last two years, receiving four-year degrees in such programs as business and accounting, all the while remaining in the Tupelo area holding down employment and/or family responsibilities.

A similar program exists in the Northwest Community College (NWCC) area in DeSoto County in conjunction with the University of Mississippi, whereby a student can obtain a four-year degree in such programs as education, accounting and business. The DeSoto Center houses both the NWCC and the UM offices and classrooms, with NWCC offering the lower level courses the first two years and UM offering upper level undergraduate courses the last two years. In addition, a similar program is working in Meridian operated through the auspices of Meridian Community College and MSU.

There has been no evidence submitted to the court to explain why the successful programs in Tupelo and DeSoto County effectively operate for place-bound students in North Mississippi, but are inade-

quate for the USMGC and Gulf Coast Community College joint venture on the Gulf Coast; and there has been no educationally justified rationale offered on which to base the addition of a four-year campus of USM on the Gulf Coast, less than 100 miles from the main campus at Hattiesburg.

The Board predicates its proposed creation of the four-year campus on the Gulf Coast as one meeting the needs of "place bound" students, who do not wish to experience the usual college experience of campus life and would presumably be students age 21 or older, who are regularly employed, perhaps married, with families. Yet, at the time of the initial March 15 deadline for applications to attend the new proposed campus, over two-thirds of the applicants were the traditional first-time freshmen enrollees, i.e., recent high school graduates, ages 17 to 19, who could choose to attend a state community college on the Coast the first two years, or go 75 miles to the Hattiesburg campus or attend one of the other universities. There were only 16 applicants age 21 or older.

Section 37–4–3, Mississippi Code Annotated, provides as follows: "... the State Board for Community and Junior Colleges [must] approve any university branch campus offering lower undergraduate level courses for credit." The State Board for Community and Junior Colleges withheld its approval for the offering by USM of lower undergraduate courses at a Gulf Coast campus. The Board presented to the court a letter from the Mississippi Attorney General to a Gulf Coast legislator which interprets a similar statute, section 37–102–3, Mississippi Code Annotated, which provides, in part:

> The Board of Trustees of State Institutions of Higher Learning shall not permit its universities to offer courses for college credit at the lower undergraduate level at an off-campus site unless approved by the State Board for Community and Junior Colleges.

The letter sets forth an advisory opinion that the proposed USMGC four-year campus is not an "off-campus site," therefore obviating the necessity to receive the approval of the State Board for Community and Junior Colleges for the building of this proposed campus. The Board cited this letter in support of its position that the proposed campus is also not a "branch campus." This interesting interpretation that the USM campus on the Coast is neither an "off-campus site" nor a "branch campus" has not been considered by any state court.

The issue before this court, however, does not relate to the educational soundness or the wisdom or financial responsibility of building an additional four-year campus on the Gulf Coast. If it did, the motion of the plaintiffs and the United States for an order enjoining the building of this campus might be granted based on the evidence that has been presented to the court on this matter. The issue before the court is whether the building of this campus on the Gulf Coast would impede or obstruct the carrying out of the Remedial Decree ordered for the desegregation of the higher educational system in the state, i.e., whether the building of this campus would thereby violate the United States Constitution because of the financial demands of the proposed new campus versus the existing campuses.

The inimitable and esteemed constitutional scholar Raoul Berger has been known to quote Supreme Court Justice Oliver Wendell Holmes, a firm believer in strictly construing the United States Constitution so as not to interfere with policies set by Congress and state legislatures. Justice Holmes stated that his duty was to apply the law and if his fellow citizens want to "go to hell in a hand basket" by writing laws that take them there, he was not there to stop them. While this court is not implying, by quoting the venerable Justice Holmes, that putting a new and ninth campus at USM's Gulf Coast campus would result in as drastic a result as used

by Justice Holmes in his example, this court is saying it could easily find, if it were inclined to an expanding view of the Constitution, a justification for interpreting the proposal for a new four-year campus as violating the Fourteenth Amendment as it applies to the desegregation orders of this court, because of a lack of rationale by the Board in building the additional campus and no proposal by the Board yet presented as to the extent of future programs to be instituted for the desegregation of the existing colleges and their costs. However, the court declines at this time to inject itself into the State's educational policy-setting area and, therefore, the motion of the private plaintiffs and the United States to enjoin the Board based on the plaintiffs' financial theory is **DENIED.**

## THE PROPOSED NEW ADMISSIONS REQUIREMENTS

The Board proposes to use the same admissions requirements that were implemented by order of this court for all institutions of higher education in 1995 with additions. The admissions policies ordered by the court eliminated the previous admissions policies which differentiated between the requirements to enter the historically black institutions and the requirements to enter the historically white institutions, thereby tending to channel black applicants to the historically black institutions and away from the historically white institutions. The new admissions requirements ordered by this court provide the same criteria for admission to all the institutions of higher learning in the state.

It was and is the court's opinion reached from the evidence presented during the 1994 trial that African–American students are more likely to qualify for and enter the historically white universities if they know, while still in high school, that certain test achievements and college preparations while in high school would be required of them in order to enter and successfully complete college work, and that they would better work to achieve those college preparatory goals. It appears that the rationale of this theory is meeting with success, as the numbers of African–American students at the traditionally white universities have risen since the new entrance requirements were implemented.

The desegregation of the historically black institutions, however, has not met with similar success in the years since 1995, although a slight increase in the numbers of whites at the historically black institutions has been seen. Of course, there has been only three years' experience to rely on and the desegregation plan of adding courses to the historically black institutions to attract white students is in its initial stages and far from complete.

■ The Board, however, has proposed adding to the existing admissions policies, ordered by the court in 1995, new criteria which involve race-based and place-based requirements. The Board proposes that the entering freshman class at the proposed new campus be reflective of the make-up of the population of the Coast area when selective admissions are used by USMGC in selecting its entering freshmen. The court is of the opinion that any racial basis used in selecting the applicants who will be admitted is contrary to the admissions policies ordered by the court in this case and, therefore, the Board is hereby ENJOINED from doing so.

■ The court also has difficulty in reconciling with the Fourteenth Amendment the proposal of the Board to limit the applicants to the proposed new state campus to residents who live in the Gulf Coast area, the Board naming several counties in the area only from which applicants would be considered. This proposed campus would be a state-financed campus, not a community college campus supported mainly by the counties in the area. The court is aware that none of the other eight four-year campuses in the state accept applications from only residents of a specific geographic area of the state.

In addition, the court has heard no rationale from the Board as to why selecting an entering freshman class that would reflect the diversity of the residents of the area would not pose a problem with gender discrimination. Would USMGC select from its applicants an entering freshman class that would reflect the percentages of men and women as well as the percentages of black and white applicants who live in the community?

These proposed additions to the admissions standards now in effect are objectionable to the court and, therefore, the Board is **ENJOINED** from going forward with its proposal for this lower level addition until such time as acceptable admissions policies are presented or a sufficient rationale is presented to justify any race-based or gender-based proposals, as well as a residence-based proposal.